STATE of Missouri, Respondent,

v.

Bobby Eugene CARROLL, Defendant,

and

A–Advanced Bail Bonds, Appellant.

No. 26438.

Missouri Court of Appeals,
Southern District,
Division Two.

July 6, 2005.

Richard L. Schnake, Neale & Newman, L.L.P., Springfield, for appellant.

Jessica D. Burns, Bolivar, for respondent.

ROBERT S. BARNEY, Judge.

Appellant A–Advanced Bail Bonds ("Appellant") posted a $5,000.00 surety bond to secure defendant Bobby Eugene Carroll's ("Carroll") presence in court. Appellant now appeals from a judgment of the trial court requiring Appellant to reimburse Respondent State of Missouri ("the State") for expenses the State and Polk County, Missouri, incurred in returning Carroll to Missouri from a location in Georgia, where he had been incarcerated. In its sole point on appeal, Appellant maintains the State did not accord Appellant the "first opportunity," pursuant to section 374.770.2, to return Carroll to Missouri.[1] Accordingly, Appellant asserts the trial court erred in entering a judgment of $2,988.59 against Appellant and seeks reversal of the judgment.

The record reveals that on June 25, 2002, Carroll was arrested and charged with two felonies in Polk County, Missouri. Appellant posted a $5,000.00 surety bond for Carroll and Carroll was released on bail. Carroll entered pleas of not guilty to both charges and a trial was set for November 4, 2002; however, Carroll failed to

---

1. Section 374.770 states:
   1. If there is a breach of the contract of the bond, the court in which the case is pending shall declare a bond forfeiture, unless the surety upon such bond informs the court that the defendant is incarcerated somewhere within the United States. If forfeiture is not ordered because the defendant is incarcerated somewhere within the United States, the surety is responsible for the return of the defendant. If bond forfeiture is ordered and the surety can subsequently prove the defendant is incarcerated somewhere within the United States, then the bond forfeiture shall be set aside and the surety be responsible for the return of the defendant. When the surety notifies the court of the whereabouts of the defendant, a hold order shall be placed by the court having jurisdiction on the defendant in the state in which the defendant is being held.

2. In all instances in which a bail bond agent or general bail bond agent duly licensed by sections 374.700 to 374.775 has given his bond for bail for any defendant who has absented himself in violation of the condition of such bond, the bail bond agent or general bail bond agent shall have the *first opportunity to return such defendant to the proper court.* If he is unable to return such defendant, the state of Missouri shall return such defendant to the proper court for prosecution, and all costs incurred by the state in so returning a defendant may be levied against the bail bond agent or general bail bond agent in question.
   (Emphasis added).
   All statutory references are to RSMo 2000 and all rules references are to Missouri Court Rules (2005) unless otherwise stated.

appear for trial on that date. As a result, a capias warrant was issued for his arrest; his bond was raised to $10,000.00; and his trial was re-scheduled for December 9, 2002. Carroll failed to appear for his December 9, 2002, trial date. The trial court noted in its docket entry that "no action [was] taken."

Thereafter, Appellant, through its agent Scott Otto ("Otto"), learned that Carroll had been arrested on October 16, 2002, in Valdosta, Georgia, on drug charges and was still in custody at that location. Otto notified Polk County Sheriff Michael Parson ("the Sheriff") of Carroll's incarceration. As Otto was having trouble obtaining information about Carroll's arrest from Georgia authorities, Otto asked the Sheriff to request information on Carroll from the Lowndes County Detention Center in Georgia. As a result, the Georgia authorities faxed information regarding the charges against Carroll to the Polk County Sheriff's Department. Otto requested permission from the Sheriff to pick up Carroll in Georgia, but the Sheriff told Otto that it was his department's obligation to do so.

On May 5, 2003, Appellant filed a motion for release from bond, which requested it be discharged from its surety bond on Carroll. Appellant also requested "that the Sheriff of Polk County, Missouri, enter into the [National Crime Information Center ("N.C.I.C.")] system the fact that there is a warrant outstanding for the arrest of [Carroll] ... so that when [Carroll] is released by the ... Georgia, authorities there will be a hold placed upon him." At the May 12, 2003, hearing on the motion, the trial court's docket entry reflects that the trial court ordered the "Sheriff ... to place the warrant in this case into the [N.C.I.C.] system," but there is no indication in the docket sheet regarding whether the trial court ruled on Appellant's motion for release from bond. The Sheriff complied with the trial court's order.[2]

At some point in time thereafter, Georgia authorities notified the Sheriff that Carroll "had cleared his charges in the State of Georgia, and that [the Sheriff's department] had 10 days to pick [Carroll] up ..." or he was going to be released. The Sheriff then notified the trial court that Carroll was in custody in Georgia. However, neither the trial court nor the Sheriff notified Appellant of Carroll's possible release.

Within a week of being notified that Carroll was ready to be transported back to Missouri, the Sheriff sent two deputies to Georgia to retrieve Carroll and return him to Polk County, Missouri. Carroll was subsequently returned to Polk County by the two deputies.

On June 6, 2003, the Sheriff sent a letter to the trial court informing it that the Sheriff's department had expended $2,988.59 in county funds to return Carroll to Polk County.[3] Three days later, Carroll appeared before the trial court and the trial court set the matter for July 14, 2003, in order to attend to "trial setting and bond issues." Carroll subsequently pleaded guilty to the charges against him and was sentenced by the trial court to a term of imprisonment.

---

**2.** The Sheriff testified that he had not placed the warrant in the N.C.I.C. system because the Missouri crimes with which Carroll was charged were not serious enough to require such a measure.

**3.** The letter stated that the Sheriff's department expended $2,226.00 for two round-trip airline tickets to Georgia; $556.50 for a one-way return ticket for Carroll; $29.83 on meals; $87.87 for a rental car while the officers were in Georgia; and, $88.39 for the night the officers had to stay in a hotel.

On July 24, 2003, the State filed a motion for forfeiture of bond and immediate judgment of default and execution, followed on October 1, 2003, by the State's motion requesting reimbursement for the $2,988.59 the Sheriff had expended in retrieving Carroll from Georgia. At the hearing on the motions, the trial court overruled the State's motion to forfeit the bond, but granted its request for a judgment against Appellant in the amount of $2,988.59 and found that Appellant was "responsible for all costs incurred by the State of Missouri and the Polk County Sheriff's Department for the return of [Carroll] from the State of Georgia."

Thereafter, Appellant filed a "Motion to Vacate Judgment, Alternative Motion to Amend Judgment, and an Alternative Motion for New Trial." Subsequently, a hearing was held on June 1, 2004, where the Sheriff testified that once he was notified by the Georgia officials that Carroll was being released, he did not advise Appellant of that fact. He stated that he was unsure if the Georgia officials notified anyone other than his office of Carroll's impending release, and that he was unaware if Appellant had been notified in any other manner. In explaining his decision to not notify Appellant, the Sheriff explained that he did not "believe that's the Polk County sheriff's office obligation to do that...." He went on to state that "at the point where [he] was court ordered to pick the prisoner up [after the filing of the detainer with N.C.I.C.], it was [the Sheriff's] obligation to go pick him up and bring him back." Additionally, the Sheriff maintained that Appellant "actually was the one who told [him] where [Carroll] was at, that [Appellant] knew [Carroll] was in custody" and the Sheriff thought Appellant had an "opportunity to pick him up." According to the Sheriff, it was his "understanding ... that [Appellant] could have been in Georgia sitting there, for a better term, outside [the jail] waiting for [Carroll] to be

released and picked him up if they had desired." The Sheriff also set out that "would have been the very first opportunity [for Appellant] to obtain [Carroll's] custody...." The Sheriff also testified that even if he had informed Appellant that Carroll was being released, Appellant would not have qualified to return him from Georgia, because under Georgia law only an appointed "agent of the state," such as a Sheriff's deputy, could have retrieved Carroll.

Otto testified that he notified the Sheriff of Carroll's whereabouts because he was required to do so by section 374.770 in order to prevent forfeiture of Carroll's bond. *See State v. Siemens,* 12 S.W.3d 776, 781 (Mo.App.2000). Otto stated that it was important that the Sheriff enter Carroll's failure to appear warrant into the N.C.I.C. system, because "upon the disposition of [Carroll's] Georgia charges, he would have walked out of their jail basically a free man with no holds on him in Missouri." Otto said that the specific reason he pushed to have the warrant placed in the N.C.I.C. system was so that Appellant could learn when Carroll was going to be released and he could then have been brought back to Missouri by Appellant.

Otto responded to the Sheriff's assertions that Appellant could have gone down to Georgia and camped out at the jail until Carroll was released, by describing how costly and time consuming such measures would have been for Appellant, given that his company had no idea as to when or if Carroll would be released. Otto testified that had Appellant been notified of Carroll's impending release, he would have obtained a trial court order appointing him as an "agent of the state" so that he could have retrieved Carroll in compliance with the laws of the State of Georgia. According to Otto, he had been appointed as an "agent of the state" on numerous, other

occasions for the specific purpose of journeying out of state to bring back a defendant prisoner.

Following the hearing, the trial court again ruled in favor of the State. In its judgment entered on July 6, 2004, the trial court specifically found that Appellant "knew exactly where [Carroll] was incarcerated and caused this Court to order a warrant for [Carroll] be placed in N.C.I.C." and that "said warrant created (at the insistence and motion of the surety) a detainer against [Carroll]" in Georgia. The trial court went on to set out that:

> under Section 17–13–46 GA Code 2002 [⁴] that the Georgia officials could then only release [Carroll] to 'agents of the demanding state;' that at no time was [Appellant] or its employe[es] an 'agent' of the State of Missouri, nor did they seek appointment from this Court as an 'agent' of the State of Missouri. The Court specifically finds that the Georgia officials were prohibited from releasing [Carroll] to [Appellant] and that there was no 'first opportunity to return such Defendant' to the Circuit Court of Polk County, Missouri as set forth in Section 374.770.2 R.S.Mo. as [Appellant] did not qualify, nor seek to qualify as an agent of the demanding state (Missouri).... As opposed to not having a detainer

placed on [Carroll], and going and staking out the Valdosta jail to pick up [Carroll] when he was released from the Georgia charges ... [Appellant] opted in writing by its motion filed in this Court to seek such a detainer. [Appellant] cannot now complain when they received exactly what they asked for.

The trial court concluded by stating that "[t]he remainder of said statutory section [374.770.2], however does apply" to the matter and entered a judgment against Appellant for $2,988.59. This appeal followed.

■ As previously set out, in its sole point on appeal, Appellant maintains the trial court erred in entering judgment against it "because the State did not give [Appellant] *the first opportunity to return* Carroll itself as § 374.770.2 requires, in that the [S]heriff, who was the only party with knowledge, failed to notify [Appellant] that the Georgia authorities were ready for Missouri to pick up Carroll...." (Emphasis added). According to Appellant, had the Sheriff advised Appellant that Carroll was ready to be extradited back to Missouri, Appellant's agents would have promptly gone to Georgia and brought the prisoner back, thereby preventing the

---

**4.** The Official Code of Georgia Annotated (Michie) section 17–13–46 (2002) states, in pertinent part:

> (a) Any person arrested in this state charged with having committed any crime in another state or alleged to have escaped from confinement, or broken the terms of his bail, probation, or parole, may waive the issuance and service of the warrant provided for in Code Sections 17–13–27 and 17–13–28 and all other procedure incidental to extradition proceedings, by executing or subscribing in the presence of a judge of any court of record within this state a writing which states that he consents to return to the demanding state; ...
> (b) If and when the consent has been duly executed, it shall forthwith be forwarded to

the office of the Governor of this state and filed therein. The judge shall direct the officer having the person in custody to deliver forthwith the person to the duly accredited agent or agents of the demanding state and shall deliver or cause to be delivered to the agent or agents a copy of the consent. Nothing in this Code section shall be deemed to limit the rights of the accused person to return voluntarily and without formality to the demanding state; nor shall this waiver procedure be deemed to be an exclusive procedure or to limit the powers, rights, or duties of the officers of the demanding state or of this state.

GA.CODE ANN. § 17–13–46 (2002).

Sheriff's office from having to expend $2,988.59 to return Carroll to Missouri.

As is evident, the key issue on appeal is the statutory interpretation of the phrase in sub-section 2 of section 374.770 which provides "the bail bond agent or general bail bond agent shall have the *first opportunity to return* such defendant to the proper court...." § 374.770.2 (emphasis added).

Under our standard of review, the "judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "Appellate courts should exercise the power to set aside a ... judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Id.* " 'We accept as true the evidence and inferences therefrom that support the trial court's judgment and disregard contrary evidence.' " *Vaughn v. Willard*, 37 S.W.3d 413, 415 (Mo.App.2001) (quoting *Rone v. Reeves*, 20 S.W.3d 526, 527 (Mo.App.2000)). " 'We keep in mind that a trial court is free to believe or disbelieve all, part, or none of the testimony of any witness.' " *Id.* (quoting *Rone*, 20 S.W.3d at 527).

■ Statutory construction is a question of law, not judicial discretion. *Eckenrode v. Dir. of Revenue*, 994 S.W.2d 583, 585 (Mo.App.1999). "The primary rule of statutory interpretation requires this Court to ascertain the intent of the legislature by considering the language used while giving the words used in the statute their plain and ordinary meaning." *Benoit v. Missouri Hwy. and Transp. Comm'n*, 33 S.W.3d 663, 673 (Mo.App.2000). In addition, "we consider the statute in the context of the entire statutory scheme on the same subject in order to discern legislative intent." *Id.* at 673–74. We must avoid statutory "interpretations that are unjust, absurd, or unreasonable." *Id.* "Where the language of a statute is clear and unambiguous, we will give effect to the language as written and will not resort to statutory construction." *Hadel v. Board of Educ. of School Dist. of Springfield, R–12*, 990 S.W.2d 107, 111 (Mo.App.1999).

■ "Under Section 374.700, if the surety can show at the time that the defendant first fails to appear that the surety's failure to produce the defendant is due to the latter's incarceration somewhere in the United States, then the court will not declare a bond forfeiture in the first instance, but the surety is liable for the return of the defendant." *Siemens*, 12 S.W.3d at 781. Accordingly, in order to effectuate a surety's responsibility to return an errant and incarcerated defendant to the State of Missouri, under circumstances as set out in section 374.770.1, the legislature has mandated that a surety, such as a "bail bond agent or general bail bond agent," shall have "the first opportunity to return such defendant to the proper court." § 374.770.2. Webster's Dictionary defines "first" as meaning "[b]efore another in time, space or importance." Merriam-Webster's Collegiate Dictionary 472 (11th ed.2003). Opportunity is defined as "a favorable juncture of circumstances." Merriam-Webster's Collegiate Dictionary 870 (11th ed.2003).

Here, the record reveals that Appellant had previously informed the trial court that Carroll was incarcerated in the State of Georgia. While Appellant knew that Carroll was in jail in Georgia, it had no knowledge as to whether Carroll was going to serve prison time, was going to be extradited, or even when he was going to be released. The trial court's finding that Appellant could have stationed its employ-

ee outside of the Valdosta County Jail in Georgia for some indeterminable period of time is unreasonable under the circumstances, because upon being informed by Georgia authorities of Carroll's impending release, a single phone call from the Sheriff could have alerted Appellant that Carroll was going to be released on a particular date. The Sheriff admitted that he did not make such an overture to Appellant.

Second, Otto testified that had he known he had ten days to retrieve Carroll he would gladly have obtained a trial court order making him an agent of the state so as to comply with Georgia law, however, he had no such notice.

Lastly, we note that nowhere in section 374.770 is there a requirement that a bonding agent be appointed "an agent of the state" prior to exercising its first opportunity to return an out-of-state incarcerated defendant to Missouri. Furthermore, this Court can conceive of certain circumstances in which a trial court would not accord a bonding agent the designation of "agent of the state" for a variety of reasons, including issues related to liability. Additionally, we can envision a situation in which a bonding agent might very well request that the sheriff or other law enforcement authorities return a defendant to the State rather than forfeit its bond.

This Court finds that given the particular facts and circumstances of this case Appellant was not accorded "the first opportunity to return" Carroll to Polk County, as required by section 374.770.2. Appellant should have been informed by the Sheriff (or the trial court) of the impending release of Carroll by Georgia authorities, in sufficient time for Appellant to have sought the designation of "agent of the state" for purposes of complying with Georgia law. However, Appellant was not so informed.

The trial court's determination that "[A]ppellant never sought to be appointed an agent for the State of Missouri to pick up [Carroll] from the Georgia authorities ..." was contrary to the mandate of section 374.770.2 and, therefore, Appellant was not given the "first opportunity" to return Carroll to Missouri.

■ With that being said, Appellant should not be permitted to escape all financial liability in this matter. Had Appellant been given the "first opportunity" to return Carroll to Missouri, Appellant would have had travel expenses of its own. Terry Marshall ("Marshall"), a bonding agent for Appellant, testified that if his company had journeyed to Georgia to retrieve Carroll they would have done so for a considerably smaller amount than that expended by the State. Specifically, Marshall related that if they had gone via private vehicle the amount would have been $411.50, and had the company utilized its private plane the amount would have been $584.40. Given the time constraints imposed by the impending release of Carroll by Georgia authorities it is reasonable to conclude that in order for Appellant to have expeditiously retrieved Carroll from the state authorities in Georgia that Appellant would have had its agent or agents use a private airplane for this purpose. Accordingly, Appellant should be liable to the State for $584.40.

Rule 84.14 allows this Court to "give such judgment as the court ought to give" and instructs that "[u]nless justice otherwise requires, the [appellate] court shall dispose finally of the case." Although the trial court here erred in awarding the State the amount of $2,988.59, this Court can render judgment that should have been rendered by the trial court in lieu of remanding the error for correction. Rule 84.14. We can make such judgments "when the record and evidence give us confidence in the reasonableness, fairness,

and accuracy of the conclusion reached." *LaRocca v. LaRocca*, 135 S.W.3d 522, 526 (Mo.App.2004). Accordingly, the award in favor of the State and against Appellant in the sum of $2,988.59 is reversed and the matter is remanded to the trial court for entry of a judgment awarding $584.40 to the State.

SHRUM, J., and BATES, C.J., concur.

KENNETH W. SHRUM, dissenting.

I respectfully dissent. I do so despite my agreement with the majority that a simple telephone call by the Sheriff to Appellant might have prevented this protracted litigation over an amount of money less than $3000.

I dissent because Appellant did virtually nothing to take advantage of the "first opportunity to return" it was given via section 374.770.2. I cannot agree that Appellant should be rewarded for its inaction. To the contrary, the policy underlying Missouri's bail bond law supports the notion that Appellant should pay for Carroll's return since Appellant made no effort to return Carroll other than (1) locate Carroll, (2) notify law enforcement officials of Carroll's whereabouts; and (3) force the Sheriff to enter Carroll's name into the NCIC database. In my view, these minimal steps did not entitle Appellant to simply wait to be notified by some sheriff or other judicial officer of Carroll's impending release and, when such voluntary notice was not given, successfully defend a motion for costs on the grounds that the lack of notice of Carroll's release date deprived it of the "first opportunity to return."

The bail bond policy to which I refer is stated in *State v. Hinojosa*, 364 Mo. 1039, 271 S.W.2d 522 (1954), thusly:

"Recognizances are not taken to enrich the treasury. They rest in humanity to an accused, and their obvious and main purpose is the enforcement of the criminal laws that defendant appear for trial or sentence. Good faith is not involved. Sureties know and solemnly contract that the defendant shall appear and abide the orders of the court and in the event of his default are bound by their obligation. Recognizances are not idle forms. If sureties, who have it in their power to insure compliance by a defendant, may be relieved because they make diligent effort for his arrest as a fugitive there exists little inducement for diligence on their part in the first instance to prevent his escape. To exonerate sureties for such reason would seriously impede the declared public policy of the State for the prevention and punishment of crime. It is more important that an accused be forthcoming for trial and of greater importance that he be forthcoming for sentence than that the expense of keeping him in prison be avoided. A lax administration of laws for the prevention or punishment of crime is not for the best interests of society and is not justified."

*Id.* at 524[3, 4].

I recognize *Hinojosa* predated section 374.770, the latter having been enacted in 1983. The changes wrought by section 374.770, however, were limited and only altered Missouri's bail bond law as follows.

First, section 374.770 enables a surety to avoid an automatic bond forfeiture or set aside a bond forfeiture if the surety proves the principal's non-appearance was caused by his or her incarceration somewhere in the United States and the surety "informs the court" about such incarceration before judgment is entered on the forfeiture order. *See State v. Goodrich*, 12 S.W.3d 770 (Mo.App.2000); *State v. Siemens*, 12 S.W.3d 776 (Mo.App.2000).

Second, section 374.770.2 provides:

"In all instances in which a bail bond agent ... has given his bond for bail for any defendant who has absented himself in violation of the condition of such bond,

the bail bond agent ... *shall have the first opportunity* to return such defendant to the proper court. If he is unable to return such defendant, the state of Missouri shall return such defendant to the proper court for prosecution, and *all costs* incurred by the state in so returning a defendant *may be levied against the bail bond agent* ... in question." (Emphasis supplied.)

Except for the relief afforded sureties via section 374.770.1 and except for the "first opportunity" language in section 374.770.2, the 1983 statute did not alter the bail bond law or policy in Missouri.[1] As such, what was said in *Hinojosa* has applicability here, namely, "lax administration of the laws for the prevention or punishment of crime is not for the best interests of society and is not justified." *Id.* at 524[4]. Equally apropos is this from *State v. Tennyson*, 537 S.W.2d 858, 860 (Mo.App. 1976): "[T]here would be little incentive for sureties to keep the principal from escaping if sureties could be excused on a showing of diligence in attempting to have the principal returned." Certainly, there would be little incentive for sureties to take advantage of their first opportunity to return if they could avoid the expense of returning by simply letting the sheriff know where the principal is and then getting the principal's name entered into the NCIC database.

Relying on the principles espoused by *Hinojosa* and *Tennyson*, I hold the view that, at a minimum, the "first opportunity to return" provision in section 374.770.2 should be interpreted to require sureties, such as Appellant, to do everything in their power to secure the return of the principal (here, Carroll) before they can

successfully use a claim of a lack of "first opportunity" to avoid paying for the return of their principal. I find support for this view in cases such as *State v. Foster*, 512 S.W.2d 448 (Mo.App.1974). Although *Foster* also predates section 374.770, it shows, by analogy, the effort that should be required of a surety before it can be relieved of retrieval expenses on the basis it was denied the first opportunity to return.

In *Foster*, the surety did everything in its power to produce the principal in court; the only remaining act to accomplish that purpose was for the state of Missouri to transport the accused. When the state failed to act, the court forfeited the bond. The appellate court reversed the forfeiture judgment, holding that when "a surety has taken *every step possible* in making the defendant available to the jurisdiction of the State of Missouri," a bond should not be forfeited when those actions are thwarted by the state's actions or inactions. *Id.* at 451. Here, however, Appellant failed to do *anything*, other than locating Carroll, notifying the Sheriff and the court of his whereabouts, asking the court to issue an order mandating that the Sheriff enter Carroll's name into the NCIC database, and waiting for the Sheriff to supply additional information.

Appellant seems to argue that it actually did everything in its power to return Carroll to Missouri and that it was merely waiting on the Sheriff to notify it that Carroll was ready to be transported to Missouri upon release by the Georgia authorities. I find this argument without merit.

First, Appellant ignores the fundamental policy of Missouri *vis-a-vis* bail bonds. As aptly stated by one court:

though cases interpreting the first subsection of the statute can be found, none have been found that deal with the "first opportunity to return" provision of the second subsection.

---

1. As noted, section 374.770.2 expressly requires the surety to pay the costs of returning a defendant. In a similar vein, section 374.770.1 provides that "the surety be responsible for the return of the defendant." Al-

"[The surety's] obligation goes not merely to bringing a defendant back from another jurisdiction, but to preventing the defendant's initial departure.... [A] surety not only has the right to prevent a defendant from leaving the state, it has an obligation, under peril of financial loss 'to keep a watch over the accused.' When it fails to do so and the result is not only departure but incarceration in another jurisdiction, *the protest that the state discouraged return in some way can only be viewed as an excuse for the surety's own failure to remedy its initial and primary error in not keeping a watchful eye.*"

*State v. Gray,* 658 S.W.2d 41, 43–44[5] (Mo.App.1983) (citations omitted) (emphasis supplied).

Second, I find no statutory support for the notion that the Sheriff had a duty to notify Appellant. Section 347.770.1 plainly states "the surety is responsible for the return of the defendant." The statute continues by stating the surety shall have the first opportunity to return the defendant. I find no requirement in the statute that the Sheriff must cooperate with the surety. The only thing the surety is entitled to under the statute is a "hold order" and the "first opportunity" to return the absent defendant. § 374.770.1–2. To add the requirement that the Sheriff must aid the surety in exercising its first opportunity of return, "would be putting something in the statute that the legislature did not." *State v. Cummings,* 724 S.W.2d 316, 318 (Mo. App.1987). This we should not do.

Because Appellant did not exercise due diligence and take every possible step to procure Carroll's presence before the court, I would hold that Appellant is liable for the costs of transporting him to Missouri. I would affirm the judgment of the trial court.