**STATE of Missouri, Appellant,**

v.

**Jeremy WILSON, Respondent.**

**No. WD 64333.**

Missouri Court of Appeals, Western District.

Aug. 30, 2005.

Michael D. Fusselman, Moberly, MO, for appellant.

Andrew Farwell, Kirksville, MO, for respondent.

Before BRECKENRIDGE, P.J., LOWENSTEIN and HARDWICK, JJ.

PATRICIA BRECKENRIDGE, Judge.

This is an interlocutory appeal by the State of Missouri from an order of the trial court suppressing marijuana seized during a search of a vehicle in which Jeremy Allen Wilson was a passenger and the incriminating statements Mr. Wilson made subsequent to the seizure. The State claims that the trial court erred in sustaining Mr. Wilson's motion to suppress the marijuana because the evidence showed that the highway patrol trooper had probable cause for the search. The State also claims that the trial court erred in suppressing statements made by Mr. Wilson both before and after the issuance of *Miranda* warnings.[1] As to the statements

---

1. Miranda warnings must be provided when a person is subjected to custodial interrogation.

made before the *Miranda* warnings, the State claims that the statements were a result of preliminary investigation rather than custodial interrogation. As to the post-*Miranda* statements, the State asserts that because the questions asked of Mr. Wilson were part of a preliminary investigation, Mr. Wilson's post-*Miranda* statements are not tainted. Finally, the State claims that the recorded statements made between Mr. Wilson and Lance Harmon, the driver of the vehicle, were improperly suppressed because the conversation occurred in a patrol car, where Mr. Wilson had no reasonable expectation of privacy.

This court finds that the trial court did not err in suppressing the marijuana because the trial court's determination that no probable cause existed for the search of the vehicle was supported by substantial evidence. This court further finds that the trial court did not err in suppressing Mr. Wilson's pre-*Miranda* statements because Mr. Wilson was not provided with his *Miranda* warnings prior to a custodial interrogation. Because of the circumstances under which Mr. Wilson was questioned after being provided his *Miranda* warnings, this court finds Mr. Wilson's post-*Miranda* statements were also properly suppressed. The trial court did err, however, in suppressing the statements made by Mr. Wilson while in the back seat of the patrol car, because Mr. Wilson had no reasonable or legitimate expectation of privacy in the back seat of a patrol car. The order of the trial court suppressing evidence is affirmed, in part, and reversed, in part.

**Factual and Procedural Background**

On March 7, 2004, Missouri State Highway Patrolman Mark Reynolds stopped a vehicle driven by Mr. Harmon for speeding on U.S. Highway 63. Mr. Wilson was a passenger in the vehicle. Trooper Reynolds approached the vehicle on the passenger side. Trooper Reynolds instructed Mr. Harmon to exit his vehicle and to sit in the patrol car while Trooper Reynolds wrote him a summons for speeding. While Mr. Harmon was still in the patrol car, Trooper Reynolds asked Mr. Harmon if he had anything illegal in the vehicle. Mr. Harmon responded that he did not. Trooper Reynolds asked Mr. Harmon for permission to search the vehicle. Mr. Harmon consented.

Trooper Reynolds directed Mr. Harmon to stand in front of his vehicle. Trooper Reynolds also asked Mr. Wilson to stand in front of Mr. Harmon's vehicle, but to face a different direction and to stand far enough apart from Mr. Harmon that they could not communicate. Trooper Reynolds then began to search the vehicle. During his search, he discovered two duffle bags, one black and one blue. When Trooper Reynolds opened the blue duffle bag, he discovered marijuana in a plastic bag. Trooper Reynolds then handcuffed Mr. Wilson and placed him in the patrol car. He also handcuffed Mr. Harmon and had him stand in front of the patrol car. Trooper Reynolds first questioned Mr. Wilson about the marijuana and the duffle bags. Mr. Wilson told Trooper Reynolds that he owned the blue duffle bag, but that he was unaware of any marijuana. Trooper Reynolds then questioned Mr. Harmon. Mr. Harmon told Trooper Reynolds that both bags and the marijuana were his. Although Trooper Reynolds told Mr. Harmon that Mr. Wilson had said the blue duffle bag was his, Mr. Harmon continued to claim both bags. Trooper Reynolds then read Mr. Harmon the *Miranda* warnings.

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 16 L.Ed.2d 694 (1966).

After reading Mr. Harmon the *Miranda* warnings, Trooper Reynolds put Mr. Harmon in the patrol car where Mr. Wilson was. Trooper Reynolds then told Mr. Wilson that he needed to read him the *Miranda* warnings. Before doing so, however, he asked Mr. Wilson whether one of the duffle bags was his. When Mr. Wilson again stated that the blue duffle bag was his, but he was unaware of the marijuana, Trooper Reynolds read Mr. Wilson his *Miranda* warnings. Trooper Reynolds then reviewed Mr. Wilson's previous statements and had Mr. Wilson confirm them. After the confirmation, Mr. Wilson and Mr. Harmon were left alone in the back seat of the patrol car. At this time, Mr. Wilson and Mr. Harmon talked about the duffle bags and marijuana. Neither Mr. Wilson nor Mr. Harmon was aware that the patrol car's audio/visual recorder was recording their conversation. In the course of this conversation, Mr. Wilson made incriminating statements regarding the possession of the marijuana.

Sergeant B.N. Anderson arrived on the scene to assist Trooper Reynolds. In explaining the circumstances of the search, Trooper Reynolds advised him that he had smelled marijuana on Mr. Harmon during the traffic stop. When the search was complete, Sergeant Anderson transported Mr. Harmon to the Randolph County jail and Trooper Reynolds transported Mr. Wilson. On the drive to the Randolph County jail, Trooper Reynolds continued questioning Mr. Wilson about the duffle bags and marijuana. During this conversation, Trooper Reynolds had Mr. Wilson describe the other contents of the blue duffle bag.

Subsequently, Trooper Reynolds completed an arrest report in which he related the circumstances surrounding the traffic stop and search. In the arrest report,

Trooper Reynolds stated that he "could smell a faint odor of marijuana emanating from inside the vehicle" when he first approached Mr. Harmon's car. Trooper Reynolds also stated that he "could smell a faint odor of marijuana about" the person of Mr. Harmon when Mr. Harmon was sitting in the patrol car waiting for Trooper Reynolds to finish writing the summons for speeding. The arrest report also stated that Trooper Reynolds asked for permission to search the vehicle after Trooper Reynolds had issued the summons for speeding. Finally, in the arrest report, Trooper Reynolds stated that, when he opened the blue duffle bag, he immediately smelled "a strong odor of marijuana." He also stated in his arrest report that he arrested Mr. Wilson and Mr. Harmon for possession of marijuana, he noted the times that he read them the *Miranda* warnings, and he set out the incriminating statements that Mr. Wilson and Mr. Harmon had made to him.

Mr. Wilson was charged with felony possession of marijuana, under section 195.202, RSMo 2000.[2] Mr. Wilson filed a motion to suppress the marijuana, his statements to Trooper Reynolds, and the statements made during his conversation with Mr. Harmon in the back seat of the patrol car. A hearing was held to determine whether the evidence should be suppressed. At the hearing, Trooper Reynolds testified that he had asked Mr. Harmon for consent to search the vehicle prior to issuing Mr. Harmon the summons for speeding. Trooper Reynolds further testified that he told Mr. Harmon that he smelled marijuana emanating from Mr. Harmon's person prior to requesting consent to search the vehicle. Trooper Reynolds testified that, during the search, he noticed a "strong odor of

2. All statutory references are to the Revised Statutes of Missouri 2000.

marijuana" while he was in the back seat of Mr. Harmon's car, but prior to opening the blue duffle bag. Trooper Reynolds stated that he placed Mr. Wilson and Mr. Harmon under arrest immediately after finding the marijuana. Trooper Reynolds conceded that he questioned Mr. Harmon prior to giving him *Miranda* warnings and stated it was inadvertent and "a mistake" not to have read the *Miranda* rights. He stated that is why, after reading the *Miranda* warnings, he asked questions that were very similar to the questions asked prior to the *Miranda* warnings. Trooper Reynolds acknowledged that he also questioned Mr. Wilson prior to giving him his *Miranda* rights and, then, after reading him the *Miranda* warnings, asked him the same questions he had asked prior to reading the *Miranda* warnings.

The audio/video recording of the entire stop, including the conversation of Mr. Wilson and Mr. Harmon in the back of the patrol car, was admitted in evidence at the hearing. Not all of the statements made by Trooper Reynolds, Mr. Harmon, and Mr. Wilson outside the patrol car were audible, likely due to the wind at the scene. Mr. Wilson also testified as to the circumstances surrounding the search and his statements.

The trial court found that Trooper Reynolds lacked probable cause to search the vehicle. The trial court also found that Mr. Harmon's consent "was not freely, voluntarily, and knowingly given." Consequently, the trial court suppressed the marijuana found during the search of the vehicle. The trial court further found that Mr. Wilson's statements both before and after he was read the *Miranda* warnings should be suppressed. Finally, the trial

court suppressed Mr. Wilson's recorded statements in the back of the patrol car "which were recorded without his knowledge." The State filed this interlocutory appeal.

## Standard of Review

 A trial court's order suppressing evidence is entitled to interlocutory appeal under section 547.200.1. "Review of a trial court's decision as to a motion to suppress evidence is limited to a determination of whether there is substantial evidence to support its decision." *State v. Tackett*, 12 S.W.3d 332, 336 (Mo.App.2000). "The trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous." *State v. Hoyt*, 75 S.W.3d 879, 882 (Mo.App. 2002). "The trial court's ruling is clearly erroneous if this court is left with a definite and firm belief a mistake has been made." *Id.* "This court reviews the trial court's decision viewing the facts and reasonable inferences therefrom in the light most favorable to the trial court's order with the freedom to disregard contrary evidence and inferences." *Id.*

## No Abuse of Discretion in Suppressing Marijuana

 The State first claims that the trial court erred in sustaining Mr. Wilson's motion to suppress the marijuana because Trooper Reynolds had probable cause to search the vehicle.[3] Specifically, the State asserts that Trooper Reynolds had probable cause because he testified that he smelled an odor of marijuana emanating from the car when Mr. Wilson lowered the window.

 "At a suppression hearing, the State bears both the burden of producing

---

3. The State does not assert that the trial court erred in finding that Mr. Harmon's consent to search was not valid because it was not freely, voluntarily, and knowingly given or question Mr. Wilson's standing to challenge Mr. Harmon's consent.

evidence and the risk of non-persuasion to show by a preponderance of the evidence that the motion to suppress should be overruled." *State v. Bradshaw,* 99 S.W.3d 73, 76 (Mo.App.2003). "The trial court may choose to believe or disbelieve all or any part of the testimony presented by the State, even though it may be uncontradicted...." *State v. Talbert,* 873 S.W.2d 321, 325 (Mo.App.1994).

In this case, Trooper Reynolds testified that, during the stop for speeding, he smelled an odor of marijuana coming from the vehicle. If believed, Trooper Reynolds' testimony would be sufficient to establish probable cause. *State v. McNaughton,* 924 S.W.2d 517, 524 (Mo. App.1996). The trial court, however, is not obligated to believe Trooper Reynolds' testimony. *State v. Carroll,* 165 S.W.3d 597, 602 (Mo.App.2005). The trial court was entitled to simply disbelieve Trooper Reynolds' testimony. *Id.*

Additionally, discrepancies between the audio/video recording, the arrest report, and Trooper Reynolds' testimony at the suppression hearing could be considered by the trial court in its determination of the credibility of Trooper Reynolds' recollection of events. First, Trooper Reynolds specifically testified that he told Mr. Harmon that he smelled marijuana on his person prior to requesting consent to search Mr. Harmon's vehicle. At the time of the request, both Mr. Harmon and Trooper Reynolds were sitting in the patrol car. The patrol car's audio/video recorder repudiates Trooper Reynolds' testimony. No such statement was captured by the recorder. Secondly, Trooper Reynolds testified that he requested consent to search Mr. Harmon's vehicle prior to issuing Mr. Harmon the summons for speeding. Yet, Trooper Reynolds' own arrest report and the patrol car's audio/video recorder establish that the summons for speeding was

issued to Mr. Harmon prior to Trooper Reynolds' request for consent to search the vehicle. Finally, Trooper Reynolds testified at the suppression hearing that he noticed "a strong odor of marijuana" while he was in the back seat of Mr. Harmon's car, but prior to opening the blue duffle bag. However, in his arrest report, Trooper Reynolds stated that he noticed the odor *after* he opened the blue duffle bag. These inconsistencies undermine Trooper Reynolds' credibility and support the trial court's disbelief of his testimony.

Trooper Reynolds' testimony regarding the odor of marijuana is the only evidence the State advances to demonstrate probable cause. Since the trial court's decision indicates that it did not believe Trooper Reynolds' statement, the State failed to meet its burden of proof. The trial court's decision to suppress the confiscated marijuana was not clearly erroneous. The State's first point is denied.

In its second point, the State asserts that all statements made by Mr. Wilson were improperly suppressed. The point addresses three categories of statements: pre-*Miranda* statements to Trooper Reynolds, post-*Miranda* statements to Trooper Reynolds, and the statements made during the conversation between Mr. Wilson and Mr. Harmon in the back seat of the patrol car. For ease of discussion, each category of statements will be discussed separately.

### No Error in Suppressing Pre-*Miranda* Statements

■ The State first claims that the statements made by Mr. Wilson to Trooper Reynolds before he received *Miranda* warnings were improperly suppressed. Specifically, the State asserts that the questions were "general, fact-seeking questions." The State further claims that a "brief detention for fact-finding purposes

does not constitute custodial interrogation."

■ "A criminal suspect is entitled to *Miranda* warnings, consistent with their Fifth Amendment right against self-incrimination, once the suspect is subjected to a 'custodial interrogation.'" *State v. Taylor,* 109 S.W.3d 190, 192 (Mo.App. 2003), (quoting *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602). The prosecution cannot use statements obtained during custodial interrogation not preceded by *Miranda* warnings. *State v. Birmingham,* 132 S.W.3d 318, 322 (Mo.App.2004). An interrogation occurs when the police obtain a statement from a suspect by using "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 302 (1980) (footnotes omitted). "For an interrogation to be custodial, the questioning must occur 'after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Birmingham,* 132 S.W.3d at 322 (quoting *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602).

"In Missouri, 'custodial interrogation' is defined as questioning initiated by law enforcement officers after a person has been taken into custody...." *State v. Glass,* 136 S.W.3d 496, 511 (Mo. banc 2004). The Missouri Supreme Court, in *State v. Werner,* 9 S.W.3d 590 (Mo. banc 2000), provided factors relevant in analyzing whether a suspect is "in custody":

> After stating that a suspect's status of being 'in custody' at a particular moment depends on the totality of the circumstances, the Missouri Supreme Court in *Werner* outlined six factors, in addition to the purpose, place, and length of the interrogation, that bear upon the determination of whether a suspect is 'in custody': (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to answer questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere was police dominated; (6) whether the suspect was placed under arrest at the termination of questioning.

*State v. Dravenstott,* 138 S.W.3d 186, 195–96 (Mo.App.2004) (quoting *State v. Werner,* 9 S.W.3d at 595). Additionally, the courts can consider "an individual's personal background, experience, familiarity with police questioning, maturity, education, and intelligence." *State v. Londagin,* 102 S.W.3d 46, 49 (Mo.App.2003).

Here, prior to making any statement, Mr. Wilson was handcuffed and placed in the back of the patrol car. Although the trial court found that Mr. Wilson was not told that he was under arrest prior to being questioned about the marijuana, the audio/video recording from the patrol car, Trooper Reynolds' arrest report, and his testimony at the suppression hearing all showed that Mr. Wilson was placed under arrest at the time he was handcuffed. Even if Mr. Wilson was not under arrest, the totality of the circumstances, as evaluated under the factors in *Werner,* 9 S.W.3d at 595, demonstrates that Mr. Wilson was under arrest-like circumstances at the time Trooper Reynolds questioned him about the marijuana and ownership of the duffle

bags. He was handcuffed and placed in the patrol car. He was not told that questioning was voluntary, that he was free to leave, or that he was not under arrest. He did not possess unrestrained movement. His initial contact with Trooper Reynolds was not voluntary. Although Trooper Reynolds did not use deceptive stratagems, the atmosphere was police dominated. The record does not contain much information about Mr. Wilson, but it does show that he was nineteen years old. Under the totality of these circumstances, Mr. Wilson was "in custody."

Having found that Mr. Wilson was "in custody," the issue then becomes whether Mr. Wilson was "'subjected to [express] questioning or its functional equivalent' in violation of *Miranda*" at the time he made the initial incriminating statement. *State v. Williams*, 163 S.W.3d 522, 526 (Mo.App.2005) (quoting *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689–90). "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Innis*, 446 U.S. at 301, 100 S.Ct. at 1690 (footnote omitted).

The Eastern District of this court recently considered whether a suspect was subject to a custodial interrogation in violation of *Miranda*, in *Williams*, 163 S.W.3d at 526. In that case, the Eastern District found that Ms. Williams was subjected to questioning or its equivalent, when she was confronted by a police officer "about the controlled substances he found in her closet as she sat handcuffed on a hallway floor, in the vicinity of, among others, her two children and five police officers." *Id.* The court found that the police officer should have known that confronting Ms. Williams about the controlled substance "was reasonably likely to elicit an inculpatory or exculpatory response"

from her and, thus, subjected her to the functional equivalent of questioning. *Id.*

Here, although there was not the number of persons present as in *Williams*, the confrontation of Mr. Wilson about the marijuana by Trooper Reynolds was also reasonably likely to elicit an incriminating or exculpatory response. The questions asked by Trooper Reynolds were not preliminary, investigatory questions made for the purpose of determining whether a crime had been committed. Trooper Reynolds first asked, "What do you want to tell me about the marijuana I found in the car?" When Mr. Wilson responded that he was unaware of any marijuana, Trooper Reynolds then asked, "Is one of those duffle bags back there yours?" Trooper Reynolds initiated questions designed to obtain information as to whether Mr. Wilson or Mr. Harmon was the one who had committed the crime by being in possession of the marijuana. Mr. Wilson was, therefore, subjected to an interrogation. *See id.*

The State cites *State v. Baker*, 850 S.W.2d 944 (Mo.App.1993), in support of its argument that Trooper Reynolds was entitled to ask Mr. Wilson general questions without violating Mr. Wilson's constitutional rights. *Baker*, however, is factually distinguishable. In *Baker*, the defendant and his cellmate were reported to have been in possession of homemade weapons and other contraband. *Id.* at 946. The defendant and his cellmate were moved to another location while their cell was searched. *Id.* After the search turned up the reported items, the captain of the correctional center asked the suspects: "Who does all this belong to?" *Id.* Defendant responded that it was his. *Id.* The court in *Baker* found that this did not constitute a custodial interrogation. *Id.* at 950. In so ruling, the court considered the circumstances

that only one general question was asked; the question was directed to both appellant and his cellmate; and both individuals were convicted felons in prison and "presumably knowledgeable of the implications of their actions." *Id.*

This case more closely resembles *Williams* than *Baker.* Here, as in *Williams,* Trooper Reynolds confronted Mr. Wilson with the fact that marijuana had been found. In contrast to *Baker,* in which only a single, generalized question was asked, Trooper Reynolds asked several questions addressed directly to Mr. Wilson. Like the *Williams* case, Mr. Wilson was handcuffed at the time of the questioning. Mr. Wilson was a nineteen-year-old involved in a highway stop for speeding. His degree of sophistication is, therefore, lower than that of the defendant in *Baker.* Like the police in *Williams,* Trooper Reynolds should have known that questioning Mr. Wilson in this manner would lead to an incriminating response. For these reasons, this court finds *Baker* inapplicable to the present case.

Further, there is evidence from which the trial court could have found that the delay in providing Mr. Wilson his *Miranda* warnings was strategic. Prior to reading Mr. Wilson his *Miranda* warnings, Trooper Reynolds informed Mr. Wilson that he was about to read Mr. Wilson his *Miranda* rights. Before proceeding to do so, however, Trooper Reynolds asked Mr. Wilson to verify that one of the duffle bags belonged to him. Mr. Wilson verified that the blue duffle bag, where the marijuana was found, was his. Immediately after Trooper Reynolds read Mr. Wilson his *Miranda* warnings, he repeated the question, confirming Mr. Wilson's incriminating statement. This type of interrogation technique is precisely what the United States Supreme Court criticized in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct.

2601, 159 L.Ed.2d 643 (2004). The Supreme Court, in *Seibert,* found that the "object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 2610. The Supreme Court held that the "question-first tactic effectively threatens to thwart *Miranda's* purpose of reducing the risk that a coerced confession would be admitted." *Id.* at 2613.

In sum, Mr. Wilson was under custodial interrogation when he made his incriminating statements. Because Trooper Reynolds' failed to provide Mr. Wilson with his *Miranda* warnings before a custodial interrogation, the trial court did not clearly err in suppressing the statements Mr. Wilson made before being provided his *Miranda* warnings.

### No Error in Suppressing Post-*Miranda* Statements

■ The State next asserts that the trial court incorrectly suppressed Mr. Wilson's post-*Miranda* statements to Trooper Reynolds. Specifically, the State argues that, because the initial questioning did not necessitate a *Miranda* warning, the subsequent questioning should not have been suppressed.

Here, Trooper Reynolds questioned Mr. Wilson and obtained incriminating information before providing Mr. Wilson his *Miranda* warnings. Immediately upon receiving Mr. Wilson's incriminating answers, Trooper Reynolds provided Mr. Wilson with his *Miranda* warnings. Trooper Reynolds then submitted the same questions to Mr. Wilson again. Mr. Wilson provided the same answers.

As noted previously, the United States Supreme Court criticized this type of interrogation technique in *Seibert, id.* at 2601. In *Seibert,* the suspect was arrested and then interrogated for thirty to forty

minutes at the station house. *Id.* at 2606. At the time of this initial questioning, the suspect had not been provided her *Miranda* warnings. *Id.* During this questioning, the suspect confessed to crimes amounting to second-degree murder. *Id.* The police then gave the suspect a twenty-minute break. *Id.* Upon returning, the police obtained a *Miranda* waiver and resumed questioning, confronting the suspect with her previous statement. *Id.* The suspect repeated the information. *Id.* The Supreme Court, in a plurality opinion, suppressed the statement and condemned this form of questioning as detrimental to *Miranda. Id.* at 2613.

The Court distinguished *Seibert* from *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, (1985). *Seibert,* 124 S.Ct. at 2612. In *Elstad,* the suspect made an incriminating statement in his home, before receiving his *Miranda* warnings. *Elstad,* 470 U.S. at 301, 105 S.Ct. at 1289. He was then taken to the police station where he was provided his *Miranda* warnings. *Id.* The suspect subsequently executed a written confession. *Id.* The Court, in *Seibert,* noted that a reasonable person, in the *Elstad* situation, "could have seen the station house questioning as a new and distinct experience." *Seibert,* 124 S.Ct. at 2612. By contrast, in the *Seibert* case, the Court believed that the twenty-minute break was an insufficient period of time to establish such a new experience. *Id.* at 2612–13. In distinguishing between the facts of the two cases, the Court identified "a series of factors" to be considered in determining "whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object:"

> [T]he completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 2612.

When considering the factors from *Seibert* and applying them to the facts of this case, this court reaches the same conclusion as the Supreme Court did. In this case, there was virtually no break between the unwarned interrogation and the interrogation after Mr. Wilson was given his *Miranda* warnings. The settings of the two interrogations were the same and Trooper Reynolds conducted both interrogations. There was a clear overlapping of the content of the two statements and Trooper Reynolds' questions treated the second round of questioning as continuous with the first. Additionally, Trooper Reynolds expressly acknowledged the need to provide Mr. Wilson with his *Miranda* warnings, but, nevertheless, waited until after he had Mr. Wilson confirm the incriminating statements to do so. The circumstances of the second questioning were such that Mr. Wilson was not "effectively advise[d] ... that he had a real choice about giving an admissible statement." *Id.* at 2610. Consequently, it cannot be said that the trial court clearly erred in suppressing Mr. Wilson's post-*Miranda* statements.

### Error in Suppressing Statement Made in Patrol Car

 Finally, the State claims that the trial court incorrectly suppressed comments made by Mr. Wilson in a conversation with Mr. Harmon while in the back seat of the patrol car. Specifically, the State avers that Mr. Wilson had no reasonable expectation of privacy in the back seat of the patrol car and, therefore, recording the conversation did not constitute an im-

proper search under the Fourth Amendment.

Two conditions must be met to properly raise a Fourth Amendment challenge. "First, the defendant must have an actual, subjective expectation of privacy in the place or thing searched. Second, the expectation of privacy must be 'reasonable' or 'legitimate.'" *State v. McCrary*, 621 S.W.2d 266, 273 (Mo. banc 1981). The State admits that Mr. Wilson's situation satisfies the first condition in that he had a subjective expectation of privacy in the patrol car. The State argues, however, that Mr. Wilson's situation does not satisfy the second condition in that a suspect cannot have a legitimate or reasonable expectation of privacy in the back seat of a patrol car.

The only case cited by Mr. Wilson as support for his argument that the recorded conversation was properly suppressed is *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), where the United States Supreme Court found that an individual had a reasonable expectation of privacy when using a telephone in a phone booth. A phone booth and the back seat of a police or patrol car are not sufficiently similar for *Katz* to be persuasive. Although not cited by the State, other jurisdictions have specifically addressed the issue of whether there is a reasonable expectation of privacy in a police or patrol car. The proper inquiry, as explained by the United States Court of Appeals, Eighth Circuit is "whether a defendant's expectation of privacy is one that society is prepared to recognize as reasonable." *United States v. Clark*, 22 F.3d 799, 801 (8th Cir.1994).

The proper inquiry into reasonableness, in turn, is "'whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society.'" *Id.* (quoting *United States v. Hendrickson*, 940 F.2d 320, 322 (8th Cir.)), *(cert denied,* 502 U.S. 992, 112 S.Ct. 610, 116 L.Ed.2d 633 (1991)). In making such inquiry, the Eighth Circuit found:

> A marked police car is owned and operated by the state for the express purpose of ferreting out crime. It is essentially the trooper's office, and is frequently used as a temporary jail for housing and transporting arrestees and suspects. The general public has no reason to frequent the back seat of a patrol car, or to believe that it is a sanctuary for private discussions.

*Clark*, 22 F.3d at 801–02. Consequently, the Eighth Circuit determined that "a person does not have a reasonable or legitimate expectation of privacy in statements made to a companion while seated in a police car." *Id.* at 802. *See also United States v. McKinnon*, 985 F.2d 525, 528 (11th Cir.1993); *State v. Smith*, 641 So.2d 849, 852 (Fla.1994); *People v. Marland*, 135 Mich.App. 297, 355 N.W.2d 378, 384 (1984); *People v. Seaton*, 146 Cal.App.3d 67, 194 Cal.Rptr. 33, 42 (1983); *State v. McAdams*, 559 So.2d 601, 602 (Fla.Dist.Ct. App.1990); *State v. Hussey*, 469 So.2d 346, 351 (La.Ct.App.1985); *State v. Lucero*, 96 N.M. 126, 628 P.2d 696, 698 (Ct.App.1981).

This court agrees that a suspect cannot have a reasonable or legitimate expectation of privacy in the back seat of a patrol car. "A police car is not the kind of public place, like a phone booth (*e.g., Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)), where a person should be able to reasonably expect that his conversation will not be monitored." *Clark*, 22 F.3d at 802. Since Mr. Wilson failed to satisfy the second condition for a valid Fourth Amendment challenge regarding his statements in the back of the patrol car, the trial court clearly erred in suppressing those statements.

■ Mr. Wilson argues, however, that, even if he did not have a reasonable expectation of privacy in the rear seat of the patrol car, the recorded conversation should nevertheless be suppressed as a "fruit-of-the-poisonous-tree."[4] In both his motion to suppress and his memorandum of law in support of suppression, Mr. Wilson argued that the recorded conversation was the "fruit" of the unwarned interrogation. Specifically, Mr. Wilson argued his will was "overborne" as both he and Mr. Harmon "were reeling from the unconstitutional tactics" employed by Trooper Reynolds. Mr. Wilson argued that after he had made the incriminating statements, his "right to silence seemed to serve no purpose, prompting [him] to speak more freely" to Mr. Harmon.[5] Mr. Wilson's argument, therefore, identified Trooper Reynolds' failure to provide *Miranda* warnings, rather than the unlawful detention, as the underlying illegality.

Mr. Wilson did not raise a Fourth Amendment fruit-of-the-poisonous-tree argument at the trial court level. The distinction between a claim that subsequent statements are tainted by a *Miranda* violation and a fruit-of-the-poisonous-tree argument based on a Fourth Amendment violation is great, because both the United States Supreme Court and Missouri Courts have recognized that very different and sophisticated analysis is required for each type of violation. *See U.S. v. Patane,* 542 U.S. 630, 124 S.Ct. 2620, 2626, 159 L.Ed.2d 667 (2004); *Elstad,* 470 U.S. 298, 105 S.Ct. 1285; *Seibert,* 542 U.S. 600, 124 S.Ct. 2601; *Glass,* 136 S.W.3d 496. In his brief on appeal, Mr. Wilson repeats his

argument that the recorded conversation is the "fruit" of the *Miranda* violation, but adds a brief reference to the unlawful seizure. The only portion of Mr. Wilson's fruit-of-the-poisonous-tree argument that references an unreasonable search under the Fourth Amendment was a portion of a single sentence: "Mr. Wilson's statements in the patrol car were not random, but in direct response to the unconstitutional search of the vehicle and container[.]" Mr. Wilson fails to develop his argument beyond this one sentence. Even if this single statement were sufficient to raise a valid Fourth Amendment issue, Mr. Wilson fails to cite any legal authority for such a proposition. Mr. Wilson's argument lacks the sophistication the subject demands.

Consequently, this court will not now examine Mr. Wilson's unsupported suggestion that the recorded conversation is a fruit of the poisonous tree stemming from the illegal search and seizure. On remand, Mr. Wilson may attempt to present a valid claim, with legal authority, that the recorded conversation should be properly suppressed as fruit of the poisonous tree.

The State's claim of error with respect to the statements Mr. Wilson made in the back seat of the patrol car is granted. Accordingly, the decision of the trial court is reversed as to this evidence. This case is remanded for further proceedings consistent with this opinion.

All concur.

---

**4.** The "fruit of the poisonous tree" is the doctrine that the product of an unlawful search or seizure, whether direct or indirect, may not be used against the victim of the search. *Wong Sun v. U.S.,* 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).

**5.** The contention that Mr. Wilson spoke because he believed his silence would serve no purpose is belied by the fact that he did not speak within hearing of Trooper Reynolds and was unaware that the patrol car recorder was on.