**STATE of Missouri, Respondent,**

v.

**Phillip A. HUGHES, Appellant.**

**No. WD 67320.**

Missouri Court of Appeals,
Western District.

Sept. 30, 2008.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 25, 2008.

Application for Transfer Denied
Jan. 27, 2009.

 

Frederick Joseph Ernst, Kansis City, MO, for appellant.

Shaun J. Mackelprang, Jefferson City, MO, for respondent.

Before JAMES M. SMART, JR., P.J., MICHAEL A. WOLFF, Sp. J.,[1] and ALOK AHUJA, J.

ALOK AHUJA, Judge.

Appellant Phillip Hughes was convicted after a bench trial of second-degree murder and armed criminal action, and was sentenced as a prior offender to two concurrent thirty-year terms of incarceration. In this direct appeal Hughes raises a single issue: whether the trial court erroneously admitted into evidence incriminating statements Hughes made while in custody and after waiving his *Miranda*[2] rights, where the police engaged him in conversation for approximately twenty minutes before advising him of his rights and soliciting the waiver. Because we conclude that the manner in which Hughes was interrogated did not violate his rights under *Miranda* and related cases, we affirm.

## I. Factual Background and Proceedings Below.

On December 3, 2003, James Kensinger was found dead in an apartment rented by Melissa Walker in Kansas City, Missouri. Kensinger had been stabbed multiple times and hit with a blunt object.

Police determined that Kensinger was also a resident of the apartment building where his body was found, and that he owned two cars: a red Chrysler van and a grey Ford Tempo. Neither of Kensinger's cars were at the apartment building, and the police issued orders to pick up anyone found driving either vehicle.

The police also learned that Hughes had been seen at Walker's apartment the day before Kensinger's body was found.

On December 12, 2003, Hughes and Walker were stopped in Kensinger's Ford Tempo in Seminole County, Florida. They were both arrested. Kansas City police detectives arrived in Florida late on the night of December 12, and proceeded to question both Hughes and Walker. Hughes' interrogation began at approximately 4:00 a.m. on December 13. The entire interrogation was videotaped.

The interrogation began with officers informing Hughes that they were in Florida to investigate the homicide of the man found in Walker's apartment, and that the interrogation was Hughes' opportunity "to tell us what you know about it." The officers stated, however, that before discussing the murder they first wanted to get some background information.

---

1. Judge Michael A. Wolff of the Supreme Court of Missouri, sitting by special assignment.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Although Hughes ultimately read and executed a form waiving his rights to remain silent and to the assistance of an attorney, the police officers questioned him for approximately twenty minutes before informing him of his rights. During that twenty minutes, the discussion covered a range of topics. The officers first asked Hughes to confirm his name and birthdate. They then asked him where he was from. This led to a discussion of Hughes' life in St. Louis and the surrounding area, his last address there, his relationships with family members, and his prior criminal and employment history. Despite difficulties securing suitable permanent employment (which he blamed on his criminal record), Hughes told the officers that "I've got skills. I'm not a retard. I'm smart, I'm good, I'm quick."

In response to the officers' questioning, Hughes explained that he had come to Kansas City to reunite with his girlfriend, Kelene (or "Kelly") Badalamenti. The officers told Hughes that they had spoken with Badalamenti, but were not sure if she had been arrested. The officers asked Hughes about the nature of his relationship with Badalementi, and with Walker (in whose apartment Kensinger's body had been found, and with whom Hughes was traveling when arrested).

The officers then asked Hughes questions about his tattoos, his experiences in school, his prior felony conviction for robbery, and problems he had experienced while incarcerated and while on parole for that offense.

During the course of this pre-*Miranda* conversation, Hughes became noticeably more relaxed and talkative. The officers evidently sought to put him at ease, expressing interest in (and understanding of) his difficulties, and laughing at his humor.

After approximately twenty minutes, the conversation paused, and the interrogating officers repeated that they were there to talk to Hughes about what had happened in Walker's apartment, and to give him a chance to tell his story. The officers told Hughes that they first needed to "make sure you're aware of your rights." Hughes responded that "I know what they are." Hughes also noted that no one had read him his rights or explained anything to him, and that "I've been left in the dark completely." Hughes said that no one had asked him anything about the case, although he had overheard the Florida officers talking about the reward they would likely receive for apprehending Hughes and Walker.

The officers then tendered Hughes a *Miranda* notice and waiver form. They asked him to read the waiver form aloud, which he did fluently. Hughes then executed the waiver form, and the discussion continued.

After Hughes executed the waiver form, the officers asked him if he knew they were coming, to which he responded: "I mean, I'm not stupid ... I knew you guys were gonna be here eventually, sooner or later, ... within 72 hours.... I knew you guys would be down here to question me."

Preliminaries concluded, Hughes then asked: "Where do we start? I mean, do you want me to start with how we came in contact with the car, or do you want me to start ... completely from the beginning?"

The officers asked Hughes to explain how he first met Walker. Hughes explained that, after coming to Kansas City to meet Badalementi, he had become friends with Walker, with whom Badalementi was staying. Hughes related that both Badalementi and Walker were using drugs heavily; although Hughes' relationship with Badalementi ended, he began to take drugs with Walker on a virtually continuous basis. During this time Hughes

stated that he also met Kensinger, who lived upstairs from Walker and was also a heavy drug user.

Hughes stated that Kensinger would often rent out his vehicles in exchange for drug money. On the day Kensinger was killed, Kensinger permitted Hughes to use his Ford Tempo in exchange for some drugs. Hughes and Walker went out during the day in the Tempo. When they left, Brad Baker was in Walker's apartment; Hughes lent Baker a knife because Baker was worried that someone would try to break into Walker's apartment while Hughes and Walker were gone.

According to Hughes, when he and Walker returned to the apartment, they found Baker standing over Kensinger, who was lying on the kitchen floor. Baker was holding the knife Hughes had lent him. Hughes stated that he saw Baker stab Kensinger at least twice. Baker then assaulted Hughes, and in the ensuing fight Hughes said that his arm was cut. Baker ran out of the apartment, telling Hughes that he would return with his cousin to kill Hughes.

Hughes stated that he checked on Kensinger, but could find no pulse or other signs of life. Hughes attempted to clean and wrap the cut on his arm, which was bleeding profusely; he ultimately went to the hospital, where he received treatment under an assumed name. After getting stitches, Hughes and Walker returned to the apartment building by bus. Kensinger's cars were gone, and his body had been dragged into one of the apartment's bedrooms. Hughes stated that he did not enter the bedroom where Kensinger's body had been taken. He left the apartment. Hughes and Walker later retrieved Kensinger's Ford Tempo, and left Kansas City together.

At the end of the interrogation police took a DNA swab from Hughes, which matched blood found in several locations in Walker's apartment—most significantly, Hughes' DNA matched blood found on the cardboard box lying under Kensinger's body where it was ultimately found in the bedroom. Testimony at trial indicated that the drops of blood on the box were consistent with "passive bleeding," in which an individual is standing still while blood drips vertically from a wound.

Hughes was indicted on February 18, 2005, for second-degree murder and armed criminal action.

Hughes filed a motion to suppress the videotape of his interrogation. At an evidentiary hearing on the motion, the circuit court heard testimony from one of the interrogating officers, and received into evidence the interrogation videotape and Hughes' executed waiver form.

The trial court denied Hughes' motion to suppress in a written order. The court first noted that "defendant's participation in [the pre-waiver] part of the interview was totally voluntary" and "[t]here was nothing coercive in this interview." The court also observed that the officers were "filling out a background information document during this portion of [the] conversation," and that "no questions were asked relating to the offense." Accordingly, the court concluded that these pre-waiver discussions "did not constitute 'interrogation' within the meaning of *Miranda*," because "[t]here is nothing in the recording to indicate that the questions asked during this interview constituted the type of interrogation *designed* to elicit incriminating statements from Mr. Hughes." [3]

3. Contrary to the trial court, in this opinion we assume—without deciding—that the pre-

waiver conversation *was* an "interrogation" prior to which *Miranda* warnings were re-

The court also emphasized that "[t]here is no evidence to suggest that the detectives were not acting in good faith in conducting the initial background interview without first administering the Miranda warning. Nothing indicates that the law enforcement officers intentionally violated *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)." Finally, the court found that Hughes "was properly advised of his Miranda rights," and "knowingly and voluntarily signed a waiver of those rights."

The court reiterated its grounds for denying the suppression motion in its Trial Minutes, which again concluded that the pre-waiver discussion "was in the nature of an interview to collect background information" in which Hughes participated voluntarily, and "was not a custodial interrogation"; the court also repeated its finding that "[t]here was no evidence of bad faith or intentional violation of Miranda."[4]

Hughes waived a jury trial and the case was tried to the court. The portion of the interrogation videotape following Hughes' *Miranda* waiver was admitted in evidence. Given our conclusion that Hughes' videotaped interrogation was properly admitted at trial, and because Hughes does not otherwise challenge the sufficiency of the evidence to convict him, we find it unnecessary to describe the other evidence at trial.

In closing, the State argued that Hughes' post-waiver statements were false, and that he had lied to conceal his own guilt. In particular, the State's closing focused on Hughes' denial that he had been in the bedroom where Kensinger's body was found, which the State argued was inconsistent with the blood evidence:

> [W]hen he had the opportunity to tell the detectives what happened he said he was never in that bedroom. And he was. That blood puts him right there. Even if you want to discount everything that [Walker] says and everything that every other witness says, we know that he drug the body in there and that alone would be enough for acting in concert, because he left the body in there to die.

The trial court found Hughes guilty of murder in the second degree and armed criminal action. Hughes was sentenced as a prior offender to two concurrent thirty-year terms of imprisonment. At sentencing, the trial court specifically referred to Hughes' videotaped statements as underscoring the gravity of his offenses:

> The thing that impresses me about it is that based on the statement that Mr. Hughes—that you gave to the police, if you in fact came upon that scene and saw that person and then absconded without making any effort or any attempt to seek any help for that person laying there dead or close to dead, it—that in itself speaks volumes about your concern for human life and humanity.

## II. Standard of Review

When reviewing a trial court's ruling on a motion to suppress, the inquiry is limited to whether the court's decision is supported by substantial evidence. Def-

---

quired. That pre-waiver discussion was not itself admitted in evidence at trial, and we hold below that the earlier discussion—*even if* an "interrogation"—did not undercut the validity of Hughes' later waiver of his rights.

**4.** When the videotape was actually offered at trial, the court expressed "some concern that the conversation that occurred with this defendant prior to administering the Miranda

Warning went beyond the collection of background data that would appear on a form," and instead "became a very conversational interview as opposed to simply collecting data and filling in the blanks on the form." The court nevertheless reaffirmed its earlier conclusion that the pre-waiver discussions did not constitute "interrogation."

erence is given to the trial court's superior opportunity to determine the credibility of witnesses. As in all matters, a reviewing court gives deference to the trial court's factual findings and credibility determinations, but reviews questions of law *de novo*.

*State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998) (citations omitted). In conducting our review, "the facts and reasonable inferences from such facts are considered favorably to the trial court's ruling and contrary evidence and inferences are disregarded." *State v. Galazin*, 58 S.W.3d 500, 507 (Mo. banc 2001).

## III. Analysis

In its seminal decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court of the United States held that, in order to give effect to the constitutional prohibition against compelled self-incrimination, an individual in police custody must be warned prior to any interrogation that he has the right to remain silent, the right to an attorney, and that anything the individual says may be used against him in a future criminal prosecution. *Id.* at 479, 86 S.Ct. 1602.

> [F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver.

*Missouri v. Seibert*, 542 U.S. 600, 608–09, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion).

Hughes' claim that his post-*Miranda*-waiver statements are inadmissible relies heavily on the Supreme Court's decision in *Seibert*. Justice Souter, writing for a four-justice plurality, stated the issue in that case as follows:

> This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda v. Arizona*, the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time. The question here is the admissibility of the repeated statement.

*Id.* at 604, 124 S.Ct. 2601 (citation omitted). In *Seibert*, the interrogating officer admitted that "he made a 'conscious decision' to withhold" *Miranda* warnings until he had elicited a confession, "thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" *Id.* at 605–06, 124 S.Ct. 2601 (citation omitted).

In these circumstances, the plurality opinion, as well as Justice Kennedy concurring in the result, concluded that statements made by the suspect could not be admitted at trial, even if those statements were made after administration of *Miranda* warnings and execution of a written waiver form. To decide whether the post-waiver statements could be admitted into evidence, the four-justice plurality proposed a test which focused on whether *Miranda* warnings could be effective:

> The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Mi-*

*randa* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Id.* at 611–12, 124 S.Ct. 2601 (footnote omitted). The plurality outlined a series of factors courts should consider in determining the effectiveness of "midstream" warnings:

> ■ the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615, 124 S.Ct. 2601.

In contrast, Justice Kennedy—who supplied the crucial fifth vote for affirmance—adopted what he characterized as "a narrower test," "applicable only in the infrequent case such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622, 124 S.Ct. 2601. Under Justice Kennedy's approach, "[w]hen an interrogator uses this deliberate, two-step strategy predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id.* at 621, 124 S.Ct. 2601.

Given that no single opinion in *Seibert* commanded the votes of a majority of the Court, what rule do we apply? *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), instructs us that, where "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Id.* at 193, 97 S.Ct. 990 (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)); *see also Panetti v. Quarterman,* 551 U.S. 930, 127 S.Ct. 2842, 2856, 168 L.Ed.2d 662 (2007). In this case, the narrowest rationale for affirmance in *Seibert* was that stated by Justice Kennedy: that a confession is inadmissible despite a belated *Miranda* warning where a "two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." 542 U.S. at 622, 124 S.Ct. 2601.

It is clear that a majority of the Court did not adopt the four-justice plurality's suggestion of a multi-factor test to determine the admissibility of such statements; instead, that rationale was rejected explicitly not only by the four dissenting Justices, but also by Justice Kennedy. *See id.* at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in judgment) ("In my view, th[e] [plurality's] test cuts too broadly."); *id.* at 627, 124 S.Ct. 2601 (O'Connor, J., dissenting) (arguing that "[w]e rejected th[e] [plurality's] theory outright" in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

On the other hand, Justice Kennedy's proposed approach—which focuses on whether interrogators attempted to deliberately evade *Miranda*'s requirements—is consistent with, albeit narrower than, the

approach the plurality advocated. The plurality framed the issue as involving the propriety of "*a police protocol* for custodial interrogation" that instructs officers to obtain a confession before administering warnings, *id.* at 604, 124 S.Ct. 2601 (emphasis added), and emphasized that the interrogating officer in *Seibert,* as well as officers around the country, had been instructed to employ this two-step, "question first, warn later" approach in order to elicit confessions. *Id.* at 605–06, 124 S.Ct. 2601 (describing interrogating officer's training); *id.* at 609–11, 124 S.Ct. 2601 (observing that "[t]he technique of interrogating in successive, unwarned and warned phases ... is not confined to Rolla, Missouri," and had in fact been "promoted ... by a national police training organization"). The plurality stressed that "[t]he object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611, 124 S.Ct. 2601; *id.* at 616, 124 S.Ct. 2601 (facts of *Seibert* "by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings"). The plurality opinion's conclusion took aim at those who deliberately sought to undermine the effectiveness of *Miranda* warnings: "[s]trategists dedicated to draining the substance out of *Miranda* cannot accomplish by training instructions what *Dickerson* [*v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000),] held Congress could not do by statute." *Id.* at 617, 124 S.Ct. 2601. While the four-justice *Seibert* plurality may have believed that inculpatory statements should be suppressed in *additional* circumstances where *Miranda* warnings were administered "midstream," they plainly concurred in the view that statements obtained as a result of intentional *Miranda* violations were inadmissible.

Thus, we believe that Justice Kennedy's "deliberate violation" standard represents a "lowest common denominator" between his views and those of the four-justice plurality. We accordingly join numerous other courts which have held that Justice Kennedy's concurring opinion supplies the standard we must apply, since it constitutes the " 'position taken by those Members [of the Court] who concurred in the judgments on the narrowest grounds.' " *Marks,* 430 U.S. at 193, 97 S.Ct. 990 (citation omitted); *see, e.g., United States v. Carter,* 489 F.3d 528, 535 (2d Cir.2007); *United States v. Courtney,* 463 F.3d 333, 338 (5th Cir.2006); *United States v. Ollie,* 442 F.3d 1135, 1142 (8th Cir.2006); *United States v. Williams,* 435 F.3d 1148, 1157–58 (9th Cir.2006); *United States v. Kiam,* 432 F.3d 524, 532–33 (3d Cir.2006); *United States v. Mashburn,* 406 F.3d 303, 308–09 (4th Cir.2005); *United States v. Stewart,* 388 F.3d 1079, 1090 (7th Cir.2004).[5]

---

**5.** It is noteworthy that the Missouri Supreme Court decision affirmed in *Seibert* likewise relied on the fact that "the breach of *Miranda* was part of a premeditated tactic to elicit a confession." *State v. Seibert,* 93 S.W.3d 700, 706 (Mo. banc 2002), *aff'd,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004); *see also State v. Glass,* 136 S.W.3d 496, 511 (Mo. banc 2004) (distinguishing *Seibert* because in earlier unwarned questioning in *Glass,* the interrogating officer "did not purposefully fail to read Glass his *Miranda* rights for fear Glass might assert them").

We acknowledge that at least three Missouri decisions analyze the admissibility of statements given after pre-warning interrogation under the multi-factor standard proposed by the *Seibert* plurality. None of those cases considers whether the plurality decision, or instead Justice Kennedy's concurrence, provides the controlling rule, however. Moreover, two of these cases referenced evidence as to whether the officers had intentionally delayed giving *Miranda* warnings. *State v. Williams,* 163 S.W.3d 522, 528 (Mo.App. E.D.2005)("unlike in *Seibert,* the trial court did not find, and the record does not reveal,

The trial court here expressly found that "[t]here is no evidence to suggest that the detectives were not acting in good faith in conducting the initial background interview without first administering the Miranda warning. Nothing indicates that the law enforcement officers intentionally violated *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)."

At oral argument, Hughes' counsel contended that no deference was due to the trial court's factual determination that the interrogating officers acted in good faith, because the court merely reviewed the videotape of the interrogation, and this Court is equally capable of reviewing the tape and forming its own conclusions. While Hughes' counsel acknowledged that one of the interrogating officers testified at the suppression hearing, he contended that the officer's testimony merely established that Hughes had executed a waiver form, and laid a foundation for admission of the interrogation videotape. But the transcript of the suppression hearing belies this characterization. During his testimony, the officer described the circumstances in which Hughes was interrogated in some detail. In particular, the officer identified two reasons, beyond collection of background information, for a pre-waiver discussion like the one which occurred here: (1) to determine whether the subject is under the influence of drugs or alcohol to an extent that would prevent the subject from meaningfully participating in an interrogation; and (2) to assess the subject's level of

intellectual functioning, facility with the English language, and ability to read. The trial court's factual determination that the officers had not deliberately violated *Miranda* was presumably based, at least in part, on its assessment of the testifying officer's credibility, not merely on its review of the video recording; we accordingly defer to its finding that the officers had no intent to violate *Miranda* by conducting their interrogation in the manner they chose.

We would affirm the trial court's denial of Hughes' suppression motion even were we to apply the *Seibert* plurality's analysis. While the pre- and post-waiver discussions were continuous in time, occurred in the same room, and involved the same police questioners (*Seibert* plurality factors (3) and (4)), as the trial court found the pre-waiver discussion touched only glancingly on the circumstances surrounding the crime: the nature of Hughes' relationship with two potential witnesses and/or suspects, Badalementi and Walker. Those issues were discussed only briefly prior to Hughes' *Miranda* waiver, however, and do not involve the events which actually constituted the crime under investigation. At oral argument, Hughes' counsel conceded that the interrogators did not seek to exploit any pre-waiver statement to deny Hughes a meaningful opportunity to exercise his constitutional rights, or to prompt or coerce him into making an admissible, inculpatory post-waiver statement. The

---

that Officer Walls used a multi-stage interrogation strategy 'adapted to undermine the *Miranda* warnings' " (citation omitted)); *State v. Wilson,* 169 S.W.3d 870, 879, 880 (Mo.App. W.D.2005)(noting that "there is evidence from which the trial court could have found that the delay in providing Mr. Wilson his *Miranda* warnings was strategic," because the interrogating officer "expressly acknowledged the need to provide Mr. Wilson with his *Miranda* warnings [at the outset of questioning],

but, nevertheless, waited until after he had Mr. Wilson confirm the incriminating statements to do so"). In the third case, the court noted that the suspect "was never asked if she were *willing to waive* her rights," but "was asked only if she *understood* her rights." *State v. Brooks,* 185 S.W.3d 265, 282 (Mo. App. W.D.2006); *id.* at 284 (reiterating that "[t]he officer did not ask Brooks if she were willing to waive her rights and continue to talk").

pre-warning discussion, as relevant to the offense, was thus brief and general, with minimal or no overlap with what followed (*Seibert* plurality factors (1) and (2)). *See United States v. Carrizales–Toledo*, 454 F.3d 1142, 1151–52 (10th Cir.2006) (affirming denial of suppression motion; in contrast to "brief (albeit damning) reply" to pre-warning questions, defendant "provided significant new information to the Agent during the second questioning"; "[i]n contrast, the interrogating officers in *Seibert* covered the same ground in both rounds of questioning").

Nor did the police attempt to treat the post-waiver discussion as continuous with what had preceded it (*Seibert* plurality factor (5)). This is "perhaps the most important[ ] factor" in the *Seibert* plurality's approach. *Carrizales–Toledo*, 454 F.3d at 1152. Here, rather than treat the discussions as continuous, before turning to a specific discussion of Kensinger's murder the officers told Hughes that they now wanted to talk about it, and had him read and execute the written notice and waiver form. By doing so the officers clearly signaled to Hughes that the nature of their conversation was about to change. Hughes' own comments show that he plainly understood that the discussion following his *Miranda* waiver was something new and different, since he asked, "[w]here do we *start*?"

Unlike *Seibert* and *State v. Wilson*, 169 S.W.3d 870 (Mo.App. W.D.2005), this is not a case where Hughes was questioned concerning the circumstances of the offense, then advised of his rights and simply urged to repeat incriminating statements he had previously made. *See Carrizales–*

*Toledo*, 454 F.3d at 1152 (affirming admissibility of statement where "there is no evidence that the agents ever referred back to Mr. Carrizales–Toledo's initial statements during the second interrogation"). The interrogating officers made it clear to Hughes what they were doing, and they alerted him when the discussion was turning to the specific offense in which he was suspected of involvement.

We are not blind to the fact that an evident purpose of the officers' pre-waiver questioning of Hughes (beyond acquiring background information, and gauging his intellectual capacity, literacy, and lucidity) was to build a rapport to facilitate Hughes' further interrogation. The officers did so by engaging Hughes in a discussion of various non-threatening subjects. As we have noted, the pre-waiver questioning appears to have served this additional purpose: on the videotape, Hughes appears noticeably more relaxed and forthcoming by the conclusion of that discussion, as opposed to when the officers first entered the interrogation room. However, nothing in that pre-waiver discussion undermined, misrepresented, or otherwise rendered ineffective the *Miranda* warning Hughes was ultimately given, or the waiver he ultimately executed (nor did the officers intend to achieve this effect, according to the trial court's findings). Even under the *Seibert* plurality's approach, this is the ultimate touchstone of the analysis: whether in the circumstances "the warnings could function 'effectively' as *Miranda* requires," giving the suspect a "real" and "informed choice" whether to make further statements, or instead terminate the discussion. 542 U.S. at 611–12, 124 S.Ct. 2601.[6]

---

**6.** Hughes argues that the pre-waiver discussions "were clearly intended to soften Hughes and get him talking so as to minimize the effect of the *Miranda* warning subsequently given and weaken his ability to knowingly and

voluntarily exercise his rights," and that the officers presented the waiver form to him "in such a way as to suggest that his signature on the form was a mere administrative task such as getting the correct spelling of his name."

Given that we find *Seibert* to be inapplicable, we must determine the admissibility of Hughes' post-waiver statements under the standard laid out in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).[7] In *Elstad,* officers had a brief conversation with an 18–year–old criminal suspect in the home he shared with his parents in the course of arresting him, prior to giving him *Miranda* warnings. During that conversation the subject incriminated himself. Officers then transported the suspect to the Sheriff's headquarters, where he was advised of, and waived, his *Miranda* rights before making a detailed inculpatory statement. *Elstad* rejected any categorical "fruit of the poisonous tree" analysis whereby the suspect's later, warned statement would be inadmissible solely because it followed an earlier unwarned statement.

It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309, 105 S.Ct. 1285. The Court also stated that ordinarily the administration of a subsequent *Miranda* warning would render any post-warning statement admissible:

[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Id.* at 314, 105 S.Ct. 1285. In making this voluntariness determination, "[t]he fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Id.* at 318, 105 S.Ct. 1285. Further, *Elstad* noted that "the officers [did not] exploit the unwarned admission to pressure respondent into waiving his right to remain silent." *Id.* at 316, 105 S.Ct. 1285; *see also State v. Glass,* 136 S.W.3d 496, 511 (Mo. banc 2004).

But other than creating a relaxed (and even friendly) atmosphere, and presenting the waiver form to Hughes in the context of that environment, the officers did nothing to prevent Hughes from making his own informed decision whether to continue discussions. They were not required to alert him to the potentially significant adverse consequences of any statements he might ultimately make. *See Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.").

7. *See Seibert,* 542 U.S. at 612 n. 4, 124 S.Ct. 2601 (plurality opinion)(if warnings could function effectively in the circumstances, "a court can [then] take up the standard issues of voluntary waiver and voluntary statement"); *id.* at 622, 124 S.Ct. 2601 (Kennedy, J., concurring)("The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed.").

Besides arguing that the belated administration of *Miranda* warnings by itself renders his subsequent statements inadmissible, Hughes makes no claim that he was coerced into giving a statement, or that his waiver of his *Miranda* rights was anything other than knowing and voluntary. Indeed, although Hughes' motion to suppress argued that his statements were not voluntary due to the length and nature of his interrogation, he does not renew that argument here. As discussed above, the circumstances surrounding Hughes' post-waiver statements do not appear to have rendered the *Miranda* warnings, and Hughes' waiver of his rights, ineffective. We also note that Hughes stated that he was familiar with his *Miranda* rights even prior to being advised of them. He also proclaimed his own intelligence more than once, and his comments appear coherent, reasonably articulate, and reflective of a person of at least average intelligence. In the absence of any contrary argument by Hughes, we find that the trial court could properly conclude that his post-*Miranda*-warning statements were voluntarily made, and therefore admissible under the *Elstad* analysis.

## IV. Conclusion

The circuit court's judgment is affirmed.

All concur.