FILED IN
COURT OF CRIMINAL APPEALS

May 12, 2015

ABEL ACOSTA, CLERK

PD-0078-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 5/12/2015 1:03:05 PM
Accepted 5/12/2015 2:19:17 PM
ABEL ACOSTA
CLERK

## No. PD-0078-15

In the
Court of Criminal Appeals

◆

No. 14-12-00096-CR
In the Court of Appeals for the Fourteenth District of Texas at Houston

◆

No. 1333231
In the 228th District Court of Harris County, Texas

◆

# JOSE VASQUEZ
*Appellant*

V.

# THE STATE OF TEXAS
*Appellee*

◆

# STATE'S BRIEF ON DISCRETIONARY REVIEW

◆

**DEVON ANDERSON**
District Attorney
Harris County, Texas

**ERIC KUGLER**
Assistant District Attorney
Harris County, Texas
TBC No. 796910
kugler_eric@dao.hctx.net

1201 Franklin, Suite 600
Houston, Texas 77002
Tel.: 713-755-5826
FAX: 713-755-5809

*Counsel for Appellee*

ORAL ARGUMENT PERMITTED

## STATEMENT REGARDING ORAL ARGUMENT

This Court has permitted oral argument in this case.

## IDENTIFICATION OF THE PARTIES

Counsel for the State:

**Devon Anderson** — District Attorney of Harris County

**Eric Kugler** — Assistant District Attorney on appeal

**Eric Devlin** — Assistant District Attorney at trial

Appellant or criminal defendant:

**Jose Vasquez**

Counsel for Appellant:

**Mark Kratovil** — Assistant Public Defender on appeal

**James Stafford; Marcy Kurtz** — Counsel at trial

Trial Judge:

**Hon. Marc Carter** — Presiding Judge

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT................................................1

IDENTIFICATION OF THE PARTIES ...............................................................1

INDEX OF AUTHORITIES................................................................................3

STATEMENT OF THE CASE.............................................................................5

ISSUES PRESENTED.........................................................................................6

    A.   The lower court's majority opinion erred in holding that the appellant preserved his two-step interrogation complaint for appellate review. ..................6

    B.   The lower court's majority opinion erred in holding that the appellant was subject to custodial interrogation prior to receiving and waiving his legal rights. 6

    C.   The lower court's majority opinion erred in holding that a two-step interrogation technique was deliberately employed by the police.........................6

    D.   The lower court's majority opinion erred in holding that the appellant was harmed by the admission of his statement when there was overwhelming evidence of the appellant's guilt independent of his statement to the police.........6

STATEMENT OF FACTS ...................................................................................6

SUMMARY OF THE ARGUMENT ..................................................................11

ARGUMENT .....................................................................................................11

PRAYER ...........................................................................................................25

CERTIFICATE OF SERVICE AND COMPLIANCE.............................................26

# INDEX OF AUTHORITIES

**CASES**

*Barfield v. State*,
  416 S.W.3d 743 (Tex. App.—
  Houston [14th Dist.] 2013, no pet.)....................................................................14

*Batiste v. State*,
  AP-76,600, 2013 WL 2424134 (Tex. Crim. App. June 5, 2013)
  *cert. denied*, 134 S. Ct. 1000 (U.S. 2014) ................................................. 14, 18

*Carmouche v. State*,
  10 S.W.3d 323 (Tex. Crim. App. 2000)...............................................................19

*Carter v. State*,
  309 S.W.3d 31 (Tex. Crim. App. 2010)................................................. 14, 21, 22

*Manzi v. State*,
  88 S.W.3d 240 (Tex. Crim. App. 2002)...............................................................20

*Maxwell v. State*,
  73 S.W.3d 278 (Tex. Crim. App. 2002)...............................................................19

*Missouri v. Seibert*,
  542 U.S. 600 (2004) ............................................................................................14

*Nguyen v. State*,
  292 S.W.3d 671 (Tex. Crim. App. 2009)..............................................................15

*Oregon v. Elstad*,
  470 U.S. 298 (1985) ............................................................................................21

*People v. Delatorre*,
  B230591, 2012 WL 909659 (Cal. Ct. App. Mar. 19, 2012)................................23

*Phillips v. Bramlett*,
  288 S.W.3d 876 (Tex. 2009).................................................................................17

*Resendez v. State*,
  256 S.W.3d 315 (Tex. App.—
  Houston [14th Dist.] 2007)..................................................................................16

*State v. Hughes*,
   272 S.W.3d 246 (Mo. Ct. App. 2008) ....................................................................23

*Vasquez v. State*,
   397 S.W.3d 850 (Tex. App.—
   Houston [14th Dist.] March 28, 2013, pet. granted) ...............................................5

*Vasquez v. State*,
   411 S.W.3d 918 (Tex. Crim. App. 2013)................................................................5

*Vasquez v. State*,
   453 S.W.3d 555 (Tex. App.—
   Houston [14th Dist.] 2014, pet. granted)............................................ 5, 14, 19, 22

## STATUTES

TEX. CODE CRIM. PROC. art. 38.22 §3 (West 2010) ........................................... 15, 16

## RULES

TEX. R. APP. P. 33.1(a) ................................................................................. 17, 18

**TO THE HONORABLE COURT OF CRIMINAL APPEALS OF TEXAS:**

## STATEMENT OF THE CASE

The appellant was charged with the capital murder of Suu Nguyen and Aleksander Lobos (CR – 2). He pled "not guilty" to the charge, and the case was tried to a jury (CR – 159). The jury found the appellant guilty, and the court thereafter assessed punishment at life in prison (CR – 159). The appellant appealed, and the court of appeals reversed the conviction, finding that the appellant's statement to the police was the result of a two-step interrogation and that he was harmed by the admission of that statement. *Vasquez v. State*, 397 S.W.3d 850 (Tex. App.—Houston [14th Dist.] March 28, 2013, pet. granted). This Court vacated and remanded for the trial court to make factual findings. *Vasquez v. State*, 411 S.W.3d 918 (Tex. Crim. App. 2013). After the trial court made findings supporting the admission of the statement, the court of appeals again reversed the conviction in a published case over a strong dissent. *Vasquez v. State*, 453 S.W.3d 555 (Tex. App.—Houston [14th Dist.] 2014, pet. granted). This Court granted review.

5

## ISSUES PRESENTED

A.    **The lower court's majority opinion erred in holding that the appellant preserved his two-step interrogation complaint for appellate review.**

B.    **The lower court's majority opinion erred in holding that the appellant was subject to custodial interrogation prior to receiving and waiving his legal rights.**

C.    **The lower court's majority opinion erred in holding that a two-step interrogation technique was deliberately employed by the police.**

D.    **The lower court's majority opinion erred in holding that the appellant was harmed by the admission of his statement when there was overwhelming evidence of the appellant's guilt independent of his statement to the police.**

## STATEMENT OF FACTS

Walter Gallo was a security guard from Miami; but he was working in Houston in 2010 (RR. III – 188-189). One of his friends from high school was Luis Ollevera (RR. III – 191, 257-258). Another friend was Walter Martinez, whom Gallo had met through his boss, Martinez's mother (RR. III – 192-193). The appellant was a very close friend of Martinez (RR. IV – 35).

On April 1, 2010, Gallo and Ollevera wanted some marijuana, so Gallo called Martinez in order to get one pound of "hydro," a higher-quality type of marijuana (RR. III – 193-195, 263-264). Martinez apparently set up a meeting with Suu Nguyen and Aleksander Lobos to acquire the marijuana (St. Ex. 150).

Nguyen drove a Toyota Scion, and Lobos owned an Infiniti G35 (RR. IV – 32) (St. Ex. 77).

When Martinez went to meet Nguyen and Lobos, the appellant and some other friends accompanied him (St. Ex. 150). There were two cars parked on the street at the meeting place on Carvel Lane, Lobos's Infiniti and Nguyen's Scion; both Nguyen and Lobos were sitting in the Scion (St. Ex. 59-78, 150). The appellant was carrying a revolver in his waistband (St. Ex. 150). At some point during the transaction, the appellant pulled out his revolver, pushed open the Scion's door, and shot both Nguyen and Lobos (St. Ex. 150) (RR. V – 52). The appellant was not sure whether he emptied the gun or not (St. Ex. 150) (RR. V – 52). The appellant or his accomplices then stole the marijuana and the Infiniti G35 (RR. III – 224, 269-270) (RR. V – 52, 55) (St. Ex. 35-38).

Lobos sustained two gunshot wounds (St. Ex. 108) (RR. IV – 156). The first bullet entered near the base of his skull, caused extensive disruption and hemorrhaging to his brain, and exited through the top of his forehead (St. Ex. 108) (RR. IV – 58, 157-160). The second bullet entered on the upper right side of his chest, perforated his right clavicle, right lung, and left rib, and caused bleeding around his heart (St. Ex. 108) (RR. IV – 163-165). One bullet also grazed his right hand (St. Ex. 108) (RR. IV – 165). No drugs were detected in his system (St. Ex. 108). Nguyen suffered two gunshot wounds (St. Ex. 109). One was to the back of

his head; the bullet sent a cone of bone fragments through his brain (St. Ex. 109) (RR. IV – 138-142). The gun was fired anywhere from two inches to four feet from Nguyen's head (RR. IV – 142-144). The second bullet went through his right shoulder blade, perforated his right lung, fractured his third rib, and was lodged in his pericardial sac (St. Ex. 109) (RR. IV – 145-147). There was a small amount of cocaine metabolite in Nguyen's blood, but it would not have been affecting his behavior at the time of the murder (RR. IV – 183).

Joe Christie lived near the intersection of Baneway and Carvel Lane (RR. III – 161). When he heard the gunshots, he rolled off his bed, grabbed his AR-15 assault rifle, and headed outside to provide assistance (RR. III – 162-163). When he got outside, he saw a Toyota Scion parked at the end of the block with its hazard lights on (RR. III – 164, 301-303). He also saw a man stumbling toward the bayou (RR. III – 164). Christie jumped in his pickup truck and drove down to the Scion (RR. III – 165). He noticed that the vehicle had been shot up with bullets and that there were two dead bodies inside, so he drove back home to call 911 (RR. III – 165-166). On the way back to his house, Christie saw a number of people running on the street and trying to hide underneath cars that were parked in driveways (RR. III – 167-168). The people ran into Martinez's house on Carvel Lane (RR. III – 168-169) (St. Ex. 6). Christie saw there was an Infiniti G35 parked in the driveway, and the garage door was open (RR. III – 169).

8

After the shooting, the appellant ran down along the bayou, pulled out the gun, and threw it away (St. Ex. 150). He then allegedly took a turn on Boone Street, ran to a gas station, and called a friend (St. Ex. 150). Meanwhile, Martinez told Gallo to be at his house off of the bayou on Carvel Lane at around 11:00 p.m. that evening (RR. III – 199, 262, 264). He also told Gallo to enter the house through the back yard (RR. III – 201-202, 265).

Gallo and Ollevera entered Martinez's house through the back door as instructed, and they saw about ten guys, including the appellant, who appeared to be "hyped up," jumpy, and celebrating (RR. III – 204-205, 211, 219, 261, 266-267, 305). The appellant stated that he had shot and killed two people for a bag of weed (RR. III – 205, 214, 268) (RR. IV – 34-35). The appellant was holding a bag of marijuana, and he showed it to Gallo (RR. III – 211, 223, 269). Gallo stated, "Y'all murdered these people for that, for that bag?" (RR. III – 225). But Gallo also saw the Infiniti G35 inside the garage and learned that the car had been taken during the murders (RR. III – 224, 269-270) (St. Ex. 35-38). The appellant did not appear to be remorseful over the killings (RR. III – 272).

Darren Chippi with the Houston Police Department was dispatched to the scene after Christie called 911 (RR. III – 300). He saw that Nguyen and Lobos were lying dead in the Scion and talked to Christie about what he had seen (RR. III – 301-303). There was a lot of blood inside the Scion, and three marijuana bulbs

9

were in the gearshift console (RR. III – 118, 122). The lead core of a bullet was near the gearshift console, and a copper jacket fragment was in the back seat (RR. III – 123). Christie pointed out Martinez's house to the police (RR. III – 170-171).

Gallo had been inside Martinez's house for about ten minutes before the police arrived (RR. III – 225, 272). He was so paranoid that he jumped the fence into the neighbor's yard and ran away, but he was eventually caught (RR. III – 226-228). Ollevera did the same with the same result (RR. III – 273-275). The officers entered Martinez's house and found a large bag of marijuana on top of the living-room sofa (RR. IV – 30). The Infiniti parked in the garage belonged to Lobos (RR. IV – 32). A police dog named Rocket was brought to the scene to look for the murder weapon (RR. III – 145). He followed a trail down the bayou but never found the gun (RR. III – 147-151) (RR. IV – 36-39) (St. Ex. 96-106).

More than two weeks after the murders, the police tracked the appellant to an apartment complex on South Post Oak (RR. IV – 65, 81). They knocked on the front door to the apartment, and a woman answered a few minutes later (RR. IV – 68). As the officers entered the apartment, a neighbor yelled that some guys were jumping off of the second-story balcony at the back of the apartment (RR. IV – 70). The suspects, including the appellant, started running down Post Oak, but the police chased them to a nearby gas station where the appellant was finally detained (RR. IV – 70-71). The appellant then gave a videotaped statement to homicide

10

detective Richard Bolton in which he admitted to shooting both of the victims (St. Ex. 150).

## SUMMARY OF THE ARGUMENT

The majority opinion below mistakenly held that the two-step-interrogation issue was preserved for appellate review when the trial court thought that the appellant was making a different objection. Furthermore, the majority opinion failed to defer to the explicit factual findings of the trial court where there was evidence in the record that the appellant was not subject to custodial interrogation prior to receiving his legal rights. The majority opinion also erred in finding deliberate misconduct by the police when there was no support in the record for such a conclusion. Finally, the majority opinion erred in holding that the appellant was harmed by the admission of his statement to the police when he bragged of his crime to numerous friends, showed the fruits of the crime, and ran from the police.

## ARGUMENT

The appellant filed a written pre-trial motion to suppress his confession, claiming that his statement was taken without a proper warning of his constitutional and statutory rights and that he was illegally arrested (CR – 54-55).

11

The trial court carried the motion with the trial; when Detective Bolton was called to testify, the trial court held a hearing outside the presence of the jury at which the appellant and Bolton were the only witnesses (RR. IV – 79, 95). The trial court apparently believed that the only purpose of the hearing was to address the voluntariness of the appellant's statement (RR. IV – 80-81).

Detective Bolton testified that the appellant was initially interviewed on April 16 and that Bolton was called in to conduct the formal interview that evening (RR. IV – 81, 85). Bolton testified that his partner, Investigator Padilla, had interviewed the appellant prior to the formal statement and that Bolton had monitored the interview, although there was conflicting evidence on that issue (RR. IV – 86, 87, 89). During the following exchange with the appellant's counsel, Bolton testified that Padilla had given the appellant his legal warnings prior to questioning him:

> Q. So, there was a time when both individuals were telling you they were not involved and didn't know what you were talking about.
>
> A. The defendants?
>
> Q. Yes.
>
> A. Yes.
>
> Q. That be fair to say?
>
> A. Yes, sir.

12

Q. And when any other officers read them their Miranda warnings, you don't know or if they were read at all 'cause you weren't there?

A. Yes, I was there. I was in the monitoring room. When they entered the room, you know, they read the defendant – and when they interviewed Mr. Martinez, they also read him his legal warnings as well.

(RR. IV – 87). The trial court found, based on its evaluation of the witnesses' testimony and credibility, that "Bolton credibly testified that Padilla had given the defendant his legal warnings prior to questioning him," and that "any statements indicating that Padilla had not given the defendant his legal warnings prior to questioning him are not credible." (CR Supp. – 23).

Bolton did not start talking to the appellant until 10:00 or 10:30 p.m., and did not take the formal videotaped statement until around midnight (RR. IV – 90-91). He stated that he gave the appellant his legal warnings, and indeed the video begins with Bolton stating, "I'm gonna read your rights to you like I did a little earlier." (St. Ex. 150). He testified that the delay in taking the formal interview was an effort to build rapport with the appellant (RR. IV – 88).

The appellant testified during the suppression hearing that the officers never read him his legal warnings when they first started talking to him (RR. IV – 97-98). The appellant further claimed that he repeatedly told the officers that he did not want to talk to them (RR. IV – 99). He admitted that he knew his rights because he had been placed in a homicide office once before (RR. IV – 99). But

13

the trial court found that the appellant's testimony was not credible (CR Supp. – 23-24).

The appellant's argument on appeal, and the basis for the lower court's reversal, was *Missouri v. Seibert*, 542 U.S. 600 (2004). *See Vasquez*, 453 S.W.3d at 563 (citing *Seibert* and *Carter v. State*, 309 S.W.3d 31, 36–37 (Tex. Crim. App. 2010)). But the appellant's two pre-trial motions to suppress made no mention of *Seibert* or "midstream warnings" or a "two-step interrogation." (CR – 54, 76). *See Barfield v. State*, 416 S.W.3d 743, 749 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citing *Batiste v. State*, AP-76,600, 2013 WL 2424134, *16 (Tex. Crim. App. June 5, 2013) *cert. denied*, 134 S. Ct. 1000 (U.S. 2014) ("At trial, appellant did not make any reference to *Seibert*, *Carter*, "two-step questioning," "question first, warn later," or any other argument that might raise an issue under *Seibert*.")).

It was not until closing argument at the suppression hearing, after the trial court had already ruled on the briefed suppression issue, that the appellant first mentioned a "two-step interview." (RR. IV – 105). Even at that point, the appellant made no mention of *Seibert*, and it was clear that the trial court did not understand the nature of the objection. Rather, the trial court believed that it was merely another aspect of the briefed issue.

The focus of the written suppression motions was the voluntariness of the appellant's statement and the State's compliance with Article 38.22 of the Code of

14

Criminal Procedure, which governs the admission of oral statements. *See* T<small>EX.</small> C<small>ODE</small> C<small>RIM.</small> P<small>ROC.</small> art. 38.22 §3 (West 2010). The appellant began his closing argument at the suppression hearing by citing *Nguyen v. State*, 292 S.W.3d 671 (Tex. Crim. App. 2009), which deals with Article 38.22 but makes no mention of *Seibert* and is not a "midstream warnings" case (RR. IV – 104-105). The trial court overruled the appellant's complaint, and the appellant then claimed that it was a "two-step interview." (RR. IV – 105-106). The trial court responded,

> All right. Only the video statements are admissible. Statements that he made that were not *videoed* are not admissible in the State's case in chief. But any statements that he made outside the *video* still could fall under, you know, 613 impeachment, in the event that he should testify. And then he could be impeached on inconsistency under 613. Otherwise, they don't come in.
>
> All right. So, I guess what I'm doing *is I'm granting your motion in part*. All right. So, any statements that he makes outside the *video*, outside of the Miranda warnings that were stated on the *video* do not come in. I'm still leaving it open in the event that it might be inconsistent. It could come in for some other purpose.

(RR. IV – 106) (emphasis added). The trial prosecutor then confirmed that he only intended to "introduce the officer, circumstances and play the *video*." (RR. IV – 107) (emphasis added).

Neither the trial court nor the trial prosecutor understood the nature of the appellant's new *Seibert* objection, which was being raised for the first time at the end of the suppression hearing. The trial court thought that the appellant's "two-step" objection referred to the fact that some of the interview was videotaped and

some of the interview was not because Article 38.22 requires that the entire statement be recorded. *See* TEX. CODE CRIM. PROC. art. 38.22 §3 (West 2010).

The trial court's response focused on the videotape, which is crucial to an Article 38.22 Section 3 challenge. *See* TEX. CODE CRIM. PROC. art. 38.22 §3 (West 2010) ("No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless: (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement."). But the presence of a videotape is irrelevant in a *Seibert* analysis. *See Carter*, 309 S.W.3d at 38 ("We therefore join numerous state and federal jurisdictions in adopting Justice Kennedy's concurrence in *Seibert* because it is narrower in scope than the plurality opinion and applies only to two-step interrogations involving deliberate police misconduct.").

Furthermore, the trial court believed that it was "granting [the] motion in part," which makes sense in the context of Article 38.22 but makes absolutely no sense in the context of a *Seibert* motion. If there were a violation of Article 38.22, then the trial court could suppress that portion of the statement that was involuntary or that was not recorded. *See, e.g., Resendez v. State*, 256 S.W.3d 315, 327 (Tex. App.—Houston [14th Dist.] 2007) *rev'd on other grounds*, 306 S.W.3d 308 (Tex. Crim. App. 2009) ("Because the interrogation of appellant was custodial

16

from the point after which appellant admitted he shot the complainant, the trial court erred in denying appellant's motion to suppress this part of appellant's statement based on appellant's failure to receive the required warnings from the law enforcement officers or waive his rights.") (citing TEX. CRIM. PROC. CODE art. 38.22, § 3). But if there were a *Seibert* violation, then the entire statement should be suppressed. *Carter*, 309 S.W.3d at 37 ("the interrogation technique used with *Seibert* undermined the goals of *Miranda* and thus required suppression.").

The appellant did nothing to correct the trial court's mistaken impression concerning the nature of the second objection, and the trial prosecutor did not recognize it as a veiled *Seibert* issue. Fortunately, the appellant cannot profit by his failure to clarify the issue for the trial court. *See* TEX. R. APP. P. 33.1(a) ("As a prerequisite to presenting a complaint for appellate review, the record must show that: (1) the complaint was made to the trial court by a timely request, objection, or motion that: (A) stated the grounds for the ruling that the complaining party sought from the trial court with *sufficient specificity to make the trial court aware of the complaint*, unless the specific grounds were apparent from the context…") (emphasis added).

In *Phillips v. Bramlett*, 288 S.W.3d 876, 882-83 (Tex. 2009), the defense counsel objected to closing argument as follows: "Judge, I object to any testimony about the propriety of other trials and the verdicts reached by other juries in

Lubbock." The trial court responded: "This is his argument, and it is not testimony." The defense counsel did not offer any further explanation of his objection, and the plaintiffs' counsel thereafter continued to argue that the jury needed to send a message to the doctors of Lubbock without further objection. On appeal, the appellant complained about the improper argument. The Texas Supreme Court cited Rule 33.1 and agreed that "the asserted error was not preserved because the trial court's response indicated that it did not understand the objection, and counsel made no further attempt to clarify the court's understanding or obtain a ruling on his objection." *Phillips*, 288 S.W.3d at 883.

In the present case, the appellant never referenced *Seibert*, *Carter*, "question first, warn later," or "mid-stream warnings" in either of his written motions to suppress or at any time during the proceedings. *See Batiste*, 2013 WL 2424134, *16 ("At trial, appellant did not make any reference to *Seibert*, *Carter*, "two-step questioning," "question first, warn later," or any other argument that might raise an issue under *Seibert*."). He waited until after the trial court had overruled his Article 38.22 argument to finally mention the term "two-step interview." (RR. IV – 105). But the trial court's response showed that it mistakenly believed that the appellant was still objecting based on Article 38.22. Therefore, the appellant failed to object with sufficient specificity to make the trial court aware of the complaint, and his sole point of error should have been overruled. *See* TEX. R. APP. P. 33.1(a);

18

*Phillips*, 288 S.W.3d at 883; *Vasquez*, 453 S.W.3d at 577-580 (Frost, J., dissenting) ("Because appellant did not timely raise the 'question first, warn later' complaint, he failed to preserve error in the trial court, and this court may not reverse the trial court's judgment based on this complaint.").

Even if the appellant had properly preserved his appellate complaint, the majority opinion nevertheless erred in finding a *Seibert* violation. As stated previously, the trial court made the factual finding that Padilla had given the defendant his legal warnings prior to questioning and that any statements to the contrary were not credible. (CR. Supp. – 23). The majority opinion erred in failing to respect the trial court's authority to make such findings. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002) ("At a suppression hearing, the trial judge is the sole and exclusive trier of fact and judge of the credibility of the witnesses and their testimony.").

The court of appeals cited *Carmouche v. State*, 10 S.W.3d 323 (Tex. Crim. App. 2000), in support of its holding that there was "indisputable" evidence to the contrary of the trial court's findings. But the *Carmouche* court stated that "the videotape presents indisputable *visual* evidence contradicting essential portions of Williams' testimony. In these narrow circumstances, we cannot blind ourselves to the videotape evidence simply because Williams' testimony may, by itself, be read to support the Court of Appeals' holding." *Carmouche*, 10 S.W.3d at 332

(emphasis added). In the present case, there was no indisputable visual evidence contradicting essential portions of Bolton's testimony. Therefore, the trial court could not have abused its discretion in making the credibility findings based on its observations of the witnesses' credibility and demeanor. *See Manzi v. State*, 88 S.W.3d 240, 244 (Tex. Crim. App. 2002) ("Trial courts are the traditional finders of fact, and their determinations of historical fact are entitled to deference.").

There is no need for this Court to "blind itself" to indisputable visual evidence contradicting Bolton's testimony that Padilla "read the defendant…his legal warnings." (RR. IV – 87). While Bolton's later testimony may have been inconsistent with the cited statement regarding Padilla's warnings, it was not indisputable visual evidence. Rather, it was merely additional testimony subject to credibility determinations, and the trial court explicitly found that such testimony was not credible (CR Supp – 23). Therefore, *Carmouche* did not allow the lower court to brush aside the trial court's findings that are based on the trial court's observation of the witnesses' demeanor and its evaluation of their credibility.

The majority opinion also failed to respect the trial court's discretion in finding that "any delay in the administration of *Miranda* warnings was due to an effort to build rapport with the defendant rather than to intentionally circumvent the protections of *Miranda*." (CR. Supp. – 25-26). The central question when determining the admissibility of post-*Miranda* warning confessions made after

20

*Miranda* violations is whether the evidence shows that the officer deliberately employed a two-step "question first, warn later" interrogation technique to circumvent the suspect's *Miranda* protections. *Carter v. State*, 309 S.W.3d 31, 36–37 (Tex. Crim. App. 2010). Because the question of whether the interrogating officer deliberately employed such a technique "will invariably turn on the credibility of the officer's testimony in light of the totality of the circumstances surrounding the interrogation," a factual finding regarding the officer's credibility is entitled to "highly deferential review." *Id.*, 309 S.W.3d at 40.

When a two-step questioning tactic has not been deliberately employed, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985). When the first statement is unwarned but not coerced, the admissibility of any subsequent statement turns on whether it is knowingly and voluntarily made. *Id.*, 470 U.S. at 309; *Carter*, 309 S.W.3d at 32.

In the present case, the only evidence that the appellant was subject to custodial interrogation prior to receiving his legal warnings came from the appellant's mouth (RR. IV – 97-98). But the trial court explicitly disbelieved the appellant's testimony at the suppression hearing (CR. Supp. 23-24). *See Guzman*, 955 S.W.2d at 89; *Ervin*, 333 S.W.3d at 213–14 ("Because the trial court found

21

credible the officers' testimony that appellant was not in custody ... even if the officers erred in their belief that she was not in custody, that error does not amount to a deliberate tactic to circumvent *Miranda*.").

The majority opinion concluded, contrary to the trial court's findings, that the fact that the appellant was in custody and gave both statements to officers at a police station "indicates that the absence of *Miranda* warnings before the beginning of the interrogation process was not a mistake but rather a conscious choice." *Vasquez*, 453 S.W.3d at 572. But as this Court has related, "the trial judge's assessment of the interrogating officer's subjective intent is especially important under Justice Kennedy's approach in *Seibert*…We therefore adopt the position of those federal and state courts that have applied a highly deferential review—similar to our *Guzman* standard—of the question of an officer's subjective 'deliberateness' in the 'question first, warn later' context." *Carter*, 309 S.W.3d at 40.

In *Seibert,* the interrogating officer testified at the suppression hearing that he made a "conscious decision" to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question "until I get the answer that she's already provided once." *Seibert*, 542 U.S. at 605-06. That was sufficient to show a deliberate intent to circumvent the protections of *Miranda*. *Id.*

In the present case, Detective Bolton testified that the delay in taking the appellant's formal interview was an effort to build rapport with the appellant (RR. IV – 88). He stated that, "sometimes it's like hours, you know, just to get – to build rapport with the individual. You know, we talk to them about a number of things, about family." (RR. IV – 88). Furthermore, the trial court explicitly found that "any delay in the administration of *Miranda* warnings was due to an effort to build rapport with the defendant rather than to intentionally circumvent the protections of *Miranda*." (CR. Supp. – 25-26). Therefore, any delay in administering legal warnings to the appellant in the present case was due to permissible rapport-building rather than to the impermissible activity of *Seibert*. *See, e.g., People v. Delatorre*, B230591, 2012 WL 909659, *5 (Cal. Ct. App. Mar. 19, 2012) (finding no *Seibert* violation where officer testified that the "conversation began, we began talking, a rapport was built, and it wasn't until some facts started to come out that I realized I had forgotten to *Miranda*."); *State v. Hughes*, 272 S.W.3d 246, 255 (Mo. Ct. App. 2008) (finding no *Seibert* violation where officers' pre-waiver questioning was to build a rapport). The trial court's ruling should have been upheld.

Finally, even if the majority opinion below were correct on the *Seibert* violation, it nevertheless erred in determining that the appellant was harmed by the admission of his statement. The evidence supporting the appellant's guilt,

23

independent of his recorded statement, was overwhelming. Both Gallo and Ollevera testified that the appellant was at Martinez's house shortly after the murder, and the appellant was bragging about having shot and killed two people for a bag of weed (RR. III – 204-205, 211, 214, 219, 261, 266-268, 305) (RR. IV – 34-35). The appellant was holding a bag of marijuana; he showed it to Gallo and did not appear to be remorseful over the murders (RR. III – 211, 223, 269, 272). Furthermore, the appellant fled from the police who were investigating these murders (RR. IV – 70-71). Finally, even the appellant's own witness admitted that the appellant had taken the marijuana from Nguyen and Lobos (RR. V – 49-50). Thus, it is unlikely that the admission of the appellant's videotaped statement had more than a slight effect on the jury's verdict, and the majority opinion below erred in holding otherwise.

## PRAYER

It is respectfully requested that the opinion of the court of appeals should be reversed and the conviction affirmed.

<div style="margin-left: 50%;">

**DEVON ANDERSON**
District Attorney
Harris County, Texas


/s/ Eric Kugler
**ERIC KUGLER**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-5826
kugler_eric@dao.hctx.net
TBC No. 796910

</div>

# CERTIFICATE OF SERVICE AND COMPLIANCE

This is to certify that: (a) the word count function of the computer program used to prepare this document reports that there are 5,581 words in it; and (b) a copy of the foregoing instrument will be served by efile.txcourts.gov to:

Mark Kratovil
Assistant Public Defender
Harris County, Texas
1201 Franklin, 13th Floor
Houston, Texas  77002
Mark.kratovil@pdo.hctx.net

Lisa McMinn
State Prosecuting Attorney
P.O. Box 13046
Austin, Texas 78711
Lisa.McMinn@SPA.texas.gov

/s/ Eric Kugler
**ERIC KUGLER**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-5826
TBC No. 796910

Date: May 12, 2015